**REEVE ALEUTIAN AIRWAYS, INC., Plaintiff,**

**v.**

**Donald E. RICE, et al., Defendants.**

**Civ. A. No. 92-0627-LFO.**

United States District Court, District of Columbia.

April 13, 1992.

---

Steven W. Silver, Michael T. Thomas, Robertson, Monagle & Eastaugh, Arlington, Va., for plaintiff.

Charles F. Flynn, Asst. U.S. Atty., Washington, D.C., for defendants.

Robert P. Silverberg, Robert W. Ludwig, Jr., Condon & Forsyth, Washington, D.C., for defendant-intervenor MarkAir, Inc.

Charles Flynn, Asst. U.S. Atty., Dept. of Justice and William Barr, Atty. Gen. of the U.S., Washington, D.C., for the U.S.

Alan Rotach, Air Force Contract Litigation Div., Washington, D.C.

Robert P. Silverberg, Condon & Forsyth, Washington, D.C.

MEMORANDUM

OBERDORFER, District Judge.

This matter is before the Court on plaintiff's Motion for Preliminary Injunction and Cross-Motions for Summary Judgment by the plaintiff, the defendants, and the intervenor. Earlier in the proceedings, the Court granted plaintiff's application for a Temporary Restraining Order, set a bond of $185,000 and then vacated the restraining order when a satisfactory bond was not posted. The Motions for Summary Judgment have been fully and ably briefed and argued and are now ripe for decision. Dispositive issues about which no material fact is in dispute can be resolved now in favor of plaintiff by a declaratory judgment.

I.

For over 40 years plaintiff, Reeve Aleutian Airways, Inc., has furnished passenger and cargo service to the Aleutian Islands, including the Island of Shemya, about 1400 miles from Anchorage, Alaska. Shemya is the site of a United States Air Force Base, and little, if anything, else. There is almost no civilian population except for those employed by the Air Force and its contractors. It does not attract tourists. While the Shemya air base has been, and continues to be, served by carriers under contract with MAC, except for a one month period in 1987, Reeve has been the only civilian carrier serving Shemya Island. During that period MarkAir, Inc., another civilian carrier, served Shemya in addition to rendering service under its contract with MAC.

Until recently, neither Reeve nor MarkAir, during its brief period of service to Shemya, was a party to any formal contract with the Air Force for the use of the landing facilities of the Shemya air field other than a support agreement embodied in a December 16, 1987 Memorandum of Understanding between Reeve and the Air Base Commander. *See* Administrative Record (A.R.) at 62–63. Reeve did lease a counter from the Air Force for which it paid rent ranging over time from $200 to $300 per month, and more recently it has leased a warehouse on the base. Reeve made its rental payments to the United States, and also paid all other charges it incurred for fuel and other ground support services directly to the United States. It paid no fee for landing rights. The passengers and cargo carried by Reeve to and from Shemya were almost exclusively government employees or contractors and cargo space was designated to them. They, apart from some dependents who visited the island, represent all of the passengers that Reeve carried. The freight charges that Reeve earned were paid by the United States, either directly or by reimbursement. The landing field at Shemya belongs to the United States and the ground crew, which serviced the Reeve planes, consisted of military and civilian employees of the United States.

In 1991, Air Force officers at Shemya determined that the relationship between the base and any civilian carrier serving Shemya air base should be formalized.[1] To this end, on October 15, 1991, Major Ronald S. Hadden, on behalf of the Department of the Air Force Specialized Contract Division at Elmendorf AFB in Alaska, published a solicitation for bids for air travel service to Shemya. A.R. at 64. The solicitation was for service from December 1, 1991 through November 30, 1992, for which the successful bidder would pay a concession fee to the Shemya Air Force Morale, Welfare and Recreation Fund. As extended, the solicitation called for bids by January 8, 1992, but incorporated by reference a provision permitting late modification to a bid so long as the late modification made its terms more favorable "to the government." *See* Solicitation, Part 14, ¶ L–37. The solicitation stated that it "contemplated" multiple awards but that only one contractor would be allowed to serve during any one "block" of days. It did not mention an exclusive contract. After several extensions, a January 8, 1992 deadline was set for bidders responding to the solicitation.

MarkAir filed a timely bid for an exclusive contract. In consideration for this privilege, MarkAir originally offered to pay 10 percent of its gross revenue derived from the Shemya service to the Shemya Air Force Morale and Welfare Fund. A.R. at 219–21. Reeve responded to the solicitation by telefaxing, late in the day on January 8, 1992, two pages of what was later submitted in hard copy as part of a formal bid. A.R. at 224–54. In the bid, Reeve offered to furnish 10 round trip tickets each month to the Fund, and "evenly spaced service during the week." It conditioned its bid on the understanding that its leasehold interests would not be affected, but Reeve did not expressly seek exclusivity. A.R. at 221.

1. The commanding officer stated an objective to create "a competitive atmosphere to lower airfare between Shemya and Anchorage." Hadden Aff. at ¶ 3.

In a Memorandum of January 9, 1992, the contracting officer determined and declared both offers to be "non conforming to the proposal." A.R. at 70. The MarkAir bid was not acceptable because it was expressly exclusive. In addition, MarkAir limited its bid to supplying service "commensurate with demand for passenger, freight and mail service" and it did not bid on a block or blocks of time. A.R. at 97. The Reeve bid was deemed to be faulty because, among other things, it came in at the last minute by telefax, an unacceptable method of transmission, bid on evenly spaced service instead of for blocks of time as called for by the solicitation, and, in the opinion of the contracting officer, was conditioned "on [Reeve] being the sole carrier." A.R. at 70. Hadden reached this conclusion by construing Reeve's insistence on preserving its leasehold interests as meaning that it reserved an exclusive right to use its leased counter space, thus making its offer a *de facto* bid for an exclusive service opportunity. If both bids were rejected Hadden reasoned, however, "the government [would] have no service" to Shemya Island. Therefore, he determined that it would be in "the best interest of the Government" to conduct discussions with both offerors, "to correct proposal deficiencies" and to request Best and Final Offers. A.R. at 70. This he proceeded to do.

A Proposal Evaluation/Decision Document summarizes the result of these negotiations and the contacting officer's decision to award the contract to MarkAir. A.R. at 77–79. In brief, the contracting officer described Reeve's Best and Final Offer as one for service on two days per week from December to April and three days per week from April through November plus 10 tickets per month. A.R. at 77. He valued the Reeve ticket offer at $11,460 per month or a total of $137,520 per year. *Id.* MarkAir, by contrast, reportedly offered service 3 days per week year round. Its concession fee offer was two tickets or $121,680 plus 10 percent of the ticket sales from Shemya which he estimated (without much confidence) at $1,170 per year. This made MarkAir's Best and Final Offer $121,000. A.R. at 78. Thereafter, the document stated that MarkAir had improved its bid as follows:

> MarkAir in unsolicited letters dated 30 & 31 Jan 92 has clarified the intent of the 10% concession fee. Mr. Bill Weir explained the CEO was out of town when the proposal was submitted and had just returned. The CEO reviewed the proposal and wanted to clarify the intent of the 10% concession fee. As a result the 30 Jan 92 letter was hand delivered to the undersigned. On 31 Jan 92 Mr. Weir called again and explained the CEO was not happy with the 30 Jan 92 clarification and thus the reason for the 31 Jan 92 clarification. MarkAir in their 31 Jan 92 letter has guaranteed a minimum of $100,000/year, they have also stated there is no maximum fee payable, it is limited only to the amount of tickets sold at Shemya. Based on legal opinion dated 6 Feb 92 and my reading of FAR 15.411, it is my determination these letters are *clarifications* within the intent of FAR 14.405 and not a modification of the proposal as stated in FAR 15.412. Therefore the total concession fee offered by MarkAir is as follows:
>
> | | |
> |---|---|
> | Ticket dollar value | $121,680 |
> | Confession Fee | 100,000 |
> | Total | $221,680 |
> | | × 5 years |
> | | $1,008,400 |

A.R. at 79 (emphasis added). From the foregoing, the contracting officer concluded that "it is my decision this contract be awarded to MarkAir as they propose *the greatest return to the United States Air Force.*" *Id.* (Emphasis added.) On February 11, 1992, the contracting officer wrote to Reeve that the contract

> has been awarded to MarkAir of Anchorage Alaska for the concession fees of

a) $8,333.33 per month

b) 2 tickets per week anywhere in the MarkAir system, no restrictions

c) 10% of ticket sales once minimum guarantee of $100,000 per year is met.

A.R. at 76.

II.

After Reeve's petition to the General Accounting Office (GAO) was rejected as untimely, it initiated this litigation by filing a Complaint on March 11, 1992. The complaint correctly invokes this Court's federal question jurisdiction, 28 U.S.C. § 1331, and the Administrative Procedures Act, 5 U.S.C. § 702. It sought a preliminary injunction or declaratory judgment that the action of the contracting officer in awarding the contract or the contract itself was arbitrary, capricious and illegal.

Plaintiff is a disappointed bidder. The exclusive award to MarkAir deprives plaintiff of a profitable business opportunity which it has enjoyed for over 40 years. It has standing to sue in its own interest and as a surrogate for the public interest in a "legally valid procurement process." *See National Maritime Union v. Commander, Military Sea Lift Command,* 824 F.2d 1228, 1237 (D.C.Cir.1987). The public interest is evidenced by the nature of the contract whereby funds, furnished by the United States to or for the benefit of service and contractor personnel for flights to this restricted base, will be enjoyed, not by the United States, but by the Shemya Morale, Welfare and Recreation Fund.

Plaintiff's claim is not precluded by the fact that the essence of its bid arrived by telefax a mere two hours before the deadline. The contracting officer waived that technicality and considered the bid. In doing so, the contracting officer was well within the authority granted to him to waive "a minor informality or irregularity" as defined in 48 C.F.R. § 14.405. Defendant cannot thereafter seize upon such an immaterial defect to preclude judicial consideration of the matter.

Nor is the plaintiff precluded by failure to seek GAO advice in a timely way. As our Court of Appeals has emphatically stated and restated, "[t]he GAO's advice is not binding upon the agency, much less upon the Court." *Irvin Industries Canada Ltd. v. United States Air Force,* 924 F.2d 1068, 1071 n. 30 (1990), quoting *Delta Data Systems Corps v. Webster,* 744 F.2d 197, 201 (D.C., Cir.1984). GAO advice is always helpful, and should usually be followed by a court, less experienced in the world of government contracts but its decision, for its own reasons, not to consider a protest in no way frees a court from its independent responsibility.

III.

Decision on the merits in this case is determined by 31 U.S.C. § 3302(b) and the requirements 48 C.F.R. § 52.215-34 as they were embodied in the calculation. Section 3302(b) provides:

> except as provided by section 3728 ... an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim.

48 C.F.R. § 52.215-34 provides:

> [A]wards shall be for the items or combinations of items that result in the lowest cost to the Government....

To this end the solicitation "contemplated" service by two carriers presumably in order to introduce price competition and thereby control "the cost to the Government." This Memorandum addresses the propriety and legality of the contract provision for payment, not to the United States, but to the "Morale, Welfare and Recreation Fund" and the apparent failure of the contracting officer to consider rationally the cost to the Government as that term is used in 48 C.F.R. § 52.215-34.

IV.

The undisputed facts applied to these requirements compel a judgment for plaintiff on the merits. The critical undisputed facts are that the solicitation offered, and the contract grants, for a consideration, landing rights and ground support at Shemya's highly classified, restricted Air

Force Base, property owned and operated by the United States government.[2] Further, the consideration derives directly from fares paid for air travel to and from Shemya, almost exclusively by military personnel, their dependents and government contractor employees—all of which were purchased, or for whom the purchases were reimbursed, by the United States.

Based on these facts, it can be concluded first, that the so-called concession fees to be paid by MarkAir were "public monies" both in the sense that they would be paid by MarkAir exclusively to purchase the use of property of the United States and in the sense that the funds were or were derived directly from public sources—United States taxpayers and the creditors of the United States who have lent it funds to cover expenses which exceed its revenue. Obviously, innovation consistent with the law should be encouraged but this transaction so plainly violates the express terms of 31 U.S.C. § 3302(b) and the purpose of 48 C.F.R. § 52.215-34 that it should be nipped in the bud.

Second, this transaction is materially different from one where a commercial carrier, deriving its revenues from the general public, contracts to make a contribution to such a fund. The source of the carrier's relevant revenues was almost entirely government payments or reimbursement of a special class of passengers. Government regulations required the contracting officer to provide whatever service was provided at the lowest cost to the government. *See* 48 C.F.R. § 52.215-34. Yet it is plain, based on the record, that "cost to government" meant to the contracting officer, "return to the Fund." This misunderstanding completely disregards the fact that the more the Fund collected, the *greater* the cost to the government. This oversight is so manifestly arbitrary and capricious as to invalidate the contract which derived from that reasoning.

Finally, defendants have cited no statutory authority or relevant precedent that authorizes a contract effecting the diversion of funds so generated. Defendant and the intervenor argue that this contract for the payment to the Fund is authorized by Air Force Regulation 176-9 which concern Air Force nonappropriated (NAF) contracts. That regulation provides in relevant part:

> This regulation states policies and procedures for Air Force nonappropriated (NAF) contracting. It applies to all purchases funded with Air Force NAF. Contracting support may, on request, be provided to Army and Air Force Exchange Service (AAFES). Purchasing support to other than qualifying DOD nonappropriated fund instrumentalities (NAFI) is prohibited.... Major command (MAJCOM), field operating agency (FOA) and direct reporting unit (DRC) supplements must have prior Air Force Morale, Welfare and Recreation Center (AFMWRC/MWOK), Randolph AFB TX 78150-6001, approval.
>
> 13-11. Concessionaire Contract Format:
>
> c. Concessionaire contracts must stipulate a fixed return to the FAFI or provide for a percentage of the income.

AFR 176-9, at 1, 65. But it does not, by its terms or by implication authorize a contract solely for the use of government property in consideration for payments derived directly and indirectly from government funds to be treated as concession fees payable to a concessionaire instead of the United States Treasury.[3]

2. The solicitation is replete with references to "the government" as the intended recipient of the services being solicited. *See* A.R. 1-48.

3. Defendant and the intervenor cite *Courdert v. United States,* 175 U.S. 178, 20 S.Ct. 56, 44 L.Ed. 122 (1899) and *United States v. Sinnott,* 26 F. 84 (Cir.Or.1886) to support their contentions. However, these cases involved payments derived from private sources and not generated and controlled by the government and were not compensation for the privilege of using government property. Further, exceptions to the general requirement of 31 U.S.C. § 3302 traditionally require statutory authority. For example, in *Matter of Job Corps Center Receipts,* the Comptroller General approved the retention of proceeds received by the Job Corps from receipts from the sales of meals and clothing, as well as the proceeds of fines and property damage restitution. 65 Comp.Gen. 666, B-215842, June 25, 1986. The decision was based on the determination that under both the Appropriations Acts

V.

In view of these considerations there is no need to address the other issues raised by plaintiff. With respect to the prayers for injunctive relief, it is well established that a "prayer for relief by injunction is not a necessary prerequisite to the exercise of judicial power, allegations of threatened irreparable injury which are material only if an injunction is sought, may likewise be dispensed with if, in other respects, the controversy presented is ... real and substantial." *Nashville, C. & St. L. Ry. v. Wallace,* 288 U.S. 249, 264, 53 S.Ct. 345, 348–49, 77 L.Ed. 730 (1933); *see also Fidelity National Bank & Trust Co. v. Swope,* 274 U.S. 123, 47 S.Ct. 511, 71 L.Ed. 959 (1927). The Declaratory Judgment Act "falls within the ambit of congressional power, so far as it authorizes relief which is consonant with the exercise of the judicial function in the determination of controversies to which under the Constitution the judicial power extends." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth,* 300 U.S. 227, 240, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). This matter fits easily into the category of "definite and concrete [controversies], touching the legal relations of parties having adverse legal interests" appropriately resolved by declaratory judgment. *See Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937); *see also South Spring Gold Co. v. Amador Gold Co.,* 145 U.S. 300, 301, 12 S.Ct. 921, 921, 36 L.Ed. 712 (1892); *Fairchild v. Hughes,* 258 U.S. 126, 129, 42 S.Ct. 274, 275, 66 L.Ed. 499 (1922); *Massachusetts v. Mellon,* 262 U.S. 447, 487, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923).

Generally, a District Court "may not substitute its own view of how a procurement should be conducted for that of the experienced contracting officer," *BMY v. U.S.,* 693 F.Supp. 1232, 1238 (D.D.C.1988), and may only act "if an agency's decision is found to be irrational" or unlawful. *Princeton Combustion Research Laboratories, Inc. v. McCarthy,* 674 F.2d 1016, 1021 (3d Cir.1982). District Court deference to the decision here, however, would countenance a plain violation of the law governing the use of public monies and the strictures requiring contracting officers to rationally consider costs to the government. Accordingly, an accompanying order will deny the Motions of defendants and intervenor for Summary Judgment as well as plaintiff's Motion for a Preliminary Injunction while granting plaintiff's Cross–Motion for Summary Judgment. It will declare that the action of the contracting officer in approving the MarkAir bid and entering into the contract with it was arbitrary, capricious and illegal in violation of the Administrative Procedure Act and that the contract is null and void. Plaintiff may, by motion filed on or before April 21, 1992, apply for other and further relief. Defendants and intervenor may reply to such motion within ten days after it is filed.

ORDER

For reasons stated in an accompanying Memorandum, it is this 13th day of April, 1992, hereby

ORDERED: that plaintiff's motion for a preliminary injunction is DENIED AS MOOT; and it is further

ORDERED: that the motions of defendants and intervenor for summary judgment are DENIED; and it is further

ORDERED: that plaintiff's motion for summary judgment is GRANTED; and it is further

DECLARED AND ADJUDGED: that the action of the contracting officer on behalf of the defendants in awarding to intervenor MarkAir, Inc. a February 11, 1992 contract to provide scheduled commercial air service to Shemya Air Force Base in consideration for concession fees to be paid by MarkAir, Inc. to the Shemya Air Force Base Morale, Welfare and Recreation Fund was arbitrary, capricious and illegal in violation of the Administrative Procedure Act,

and 29 U.S.C. § 1551(m), fines generated under these programs could be "retained by the recipient to continue to carry out the program ..." *Id.*

5 U.S.C. § 702 and 31 U.S.C. § 3302(b); and it is further

ORDERED: that the contract of February 11, 1992 is null, void and of no force and effect; and it is further

ORDERED: that plaintiff may, by motion filed on or before April 21, 1992, apply for other and further relief. Defendants and intervenor may reply to such motion within 10 days after it is filed.