**SCHEDULED AIRLINES TRAFFIC OFFICES, INC., Appellant,**

v.

**DEPARTMENT OF DEFENSE, Appellee.**

No. 94–5401.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 26, 1996.

Decided July 5, 1996.

Kenneth S. Kramer, Washington, D.C., argued the cause for appellant, with whom Douglas W. Baruch and James S. Kennell were on the brief.

Cynthia A. Schnedar, Assistant United States Attorney, Washington, D.C., argued the cause for appellee, with whom Eric H. Holder, Jr., United States Attorney, R. Craig Lawrence and Michael J. Ryan, Assistant United States Attorneys, Washington, D.C., were on the brief.

J. Scott Hommer, McLean, VA, argued the cause for amicus curiae, with whom Kenneth C. Bass, III, Great Falls, VA, Bruce E. Titus and Lars E. Anderson, McLean, VA, were on the brief.

Before: BUCKLEY, HENDERSON and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Certain Department of Defense agencies require that private companies serving as on-site government travel agencies contribute a portion of their revenues to local "Morale, Welfare, and Recreation" Funds. Morale Funds provide recreational and other services to members of the military community. A travel agency challenges the requirement to contribute to Morale Funds, arguing that it violates several federal laws. Concluding that the travel agency has standing, we hold that because the travel revenues derive from government procurement contracts in consideration for government resources, the practice violates the Miscellaneous Receipts statute, 31 U.S.C. § 3302(b) (1994), which requires government officials receiving "money for the Government from any source" to deposit the money in the Treasury.

## I.

Federal agencies typically obtain travel services by contracting with private companies to operate commercial travel offices on the agency's premises. Except for the price of tickets and other travel accommodations, the government pays nothing for the service; it merely provides contractors with free office space, utilities, and similar amenities. Contractors benefit by serving as exclusive on-site travel agents, earning revenues like ordinary travel agents through commissions from airlines, hotels, and other travel providers. In exchange for these benefits, contractors agree to pay agencies monthly "concession fees" based on a percentage of gross revenues.

In April 1994, the Defense Construction Supply Center, an agency of the Department of Defense, issued a solicitation seeking services for both "official" travel, meaning Government-sponsored travel paid for with appropriated funds, and "unofficial" travel, defined as "[l]eave, furlough, vacation, and leisure travel paid for from personal funds of the traveler for personal use." The solicitation required bids to include two different "concession fees": a percentage of official travel sales, which the Supply Center would deposit into the United States Treasury; and a percentage of unofficial travel sales, which the Supply Center would turn over to the local "Morale, Welfare, and Recreation" Fund, a nonappropriated fund instrumentality established by internal agency regulation whose mission is to provide "morale, welfare, and recreation (MWR) activities, including food and beverage, retail, recreation, lodging, and community support services ... for ... members of the military community." The solicitation required that the concession fee percentage for official travel exceed the percentage for unofficial travel, with a minimum of three percent for each.

Appellant Scheduled Airlines Traffic Offices, Inc., a travel agency also known as Sato, had competed unsuccessfully for similar travel office contracts on several occasions

prior to the April 1994 solicitation. In each instance, the Army awarded the contract to a Sato competitor who, compared to Sato, had offered the government a higher concession fee for unofficial travel and a lower fee for official travel. Based on post-award discussions with Defense Department personnel, Sato learned that the agency had awarded the contracts to its competitors largely to maximize payments to the local Morale Funds.

Sato bid on the Supply Center's April 1994 solicitation and then challenged the solicitation's terms in a bid protest to the General Accounting Office. Among other arguments, Sato contended that depositing the monthly concession fees into Morale Funds violates the Miscellaneous Receipts statute, which requires "official[s] or agent[s] of the Government receiving money for the Government from any source [to] deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." 31 U.S.C. § 3302(b). After the GAO denied Sato's protest, Sato filed suit in the United States District Court for the District of Columbia seeking declaratory and injunctive relief to prohibit the Supply Center from awarding a contract based on the April 1994 solicitation, as well as "[s]uch other and further relief as the Court deems appropriate." The Defense Department agreed to stay the procurement pending the district court's decision. On cross-motions for summary judgment, the district court rejected Sato's challenge, entering judgment for the Defense Department. The Supply Center subsequently awarded Sato the contract. Sato nonetheless appeals, challenging the requirement that it pay a portion of its fees into the Morale Fund.

## II.

We deal first with the Government's argument that Sato lacks standing to bring this suit. To have Article III standing, a party "must demonstrate three things: (1) 'injury in fact' ...; (2) a causal relationship between the injury and the challenged conduct ...; and (3) a likelihood that the injury will be redressed by a favorable decision...." *Northeastern Fla. Chapter of As-sociated General Contractors of America v. Jacksonville*, 508 U.S. 656, 663, 113 S.Ct. 2297, 2302, 124 L.Ed.2d 586 (1993) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)) (other citations omitted).

With respect to whether Sato has shown injury in fact, we have often found disappointed bidders for government contracts to have suffered sufficient injury for standing purposes. Both the economic loss and the injury to a bidder's "right to a legally valid procurement process" are cognizable harms. *National Maritime Union of America, AFL–CIO v. Commander, Military Sealift Command*, 824 F.2d 1228, 1237 (D.C.Cir. 1987). Not disputing this proposition, the Government argues that because Sato was awarded the contract, it is not a *disappointed* bidder and thus suffered no economic injury from the April 1994 solicitation.

We think the Government's argument misconceives the nature of Sato's complaint and the remedy it seeks. A fair reading of the complaint as a whole indicates that Sato's allegations extend beyond the Supply Center's single April 1994 solicitation. The named defendant is the Department of Defense, not the Supply Center, and the complaint mentions not only the Supply Center's April 1994 solicitation, but also "recent similar [Defense Department] procurements." Compl. ¶ 21. The complaint also alleges that "[a]bsent a declaration that the [Supply Center's] method of procuring commercial travel services is unlawful, [the Supply Center] and other components of [Defense] will continue to procure such services in an unlawful manner," *id.* ¶ 4, and that "[u]nless the procurement practices complained of herein are enjoined, future [commercial travel office] procurements will be conducted in a comparable unlawful manner." *Id.* ¶ 22. Moreover, Sato sought "forward-looking [declaratory and injunctive] relief," *Adarand Constructors, Inc. v. Pena*, — U.S. —, —, 115 S.Ct. 2097, 2104, 132 L.Ed.2d 158 (1995), not damages for economic injury. Although the more specific paragraphs in Sato's prayer for relief mention only the April 1994 solicitation, Sato also sought "[s]uch other and further relief as the Court

deems appropriate." *Id.* at 8–9; *see also* Fed.R.Civ.P. 54(c) (requiring courts to grant appropriate relief "even if the party has not demanded such relief in the party's pleadings"). Sato's alleged injury, therefore, is to its right to participate not only in the April 1994 solicitation, but also in all similar travel office solicitations. Sato's lack of economic injury from the April 1994 solicitation is thus irrelevant. Moreover, because the requirement to deposit separate concession fees for unofficial travel into Morale Funds is part of an on-going Army procurement policy, *see* Army Regulation 215–2, at ¶ 6–63(d); Chandler Aff. ¶ 5, Sato's future injury is "actual or imminent, not conjectural or hypothetical," *Adarand,* —— U.S. at ——, 115 S.Ct. at 2104 (quoting *Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136).

Sato also satisfies the second and third requirements for Article III standing. It contends that the Department's policy of combining unofficial and official travel along with the requirement to deposit unofficial travel concession fees into Morale Funds places Sato at a competitive disadvantage relative to larger travel companies "because the combined contract is too large for small business concerns ... to handle," thus making it more difficult for smaller companies like Sato to offer high concession fees for unofficial travel. Ursini Oct. 2, 1994 Decl. ¶ 24. Sato therefore alleges a "causal relationship" between its injury and the challenged conduct. Moreover, a favorable decision would likely redress Sato's injury to its right to a legally valid procurement process. Although one result of a favorable decision would be the transfer of unofficial travel concession fees from the various Morale Funds to the United States Treasury, another would likely be the elimination of unofficial travel concession fees as a factor in the procurement selection process, thus ensuring a "legally valid procurement process," precisely what Sato seeks.

■ Because Sato brought this action under the Administrative Procedure Act, 5 U.S.C. § 702 (1994), it must also establish that it has "prudential standing" by showing that its interests are "arguably within the zone of interests to be protected or regulated by the statute ... in question." *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 396, 107 S.Ct. 750, 755, 93 L.Ed.2d 757 (1987) (quoting *Association of Data Processing Service Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)). Because Sato is neither a government official nor the United States Treasury, it is clearly not within the zone of interests "regulated" by the Miscellaneous Receipts statute. It must therefore show that it is arguably within the zone of interests "protected" by the statute. A party may demonstrate this in one of two ways: "if it is among those [who] Congress expressly or directly indicated were the intended beneficiaries of a statute," *Hazardous Waste Treatment Council v. Thomas,* 885 F.2d 918, 922 (D.C.Cir.1989) (*HWTC IV*), or if it is a "suitable challenger" to enforce the statute—that is, if its "interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not 'more likely to frustrate than to further ... statutory objectives.'" *First Nat'l Bank & Trust Co. v. National Credit Union Admin.,* 988 F.2d 1272, 1275 (quoting *Clarke,* 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12) (alteration to conform to *Clarke* ).

We thus first ask whether Congress explicitly intended an entity such as Sato to be a beneficiary of the statute. The answer quite clearly is no. Originally enacted in 1849, the Miscellaneous Receipts statute and its legislative history indicate that Congress did not expressly intend to benefit a third party such as Sato. *See* Act of Mar. 3, 1849, ch. 110, § 1, 9 Stat. 398. Prior to the statute's enactment, some Executive branch officials had failed to deposit in the Treasury the entire amount of Government money they received, instead deducting various sums before depositing the remainder in the Treasury. The primary example cited by the statute's drafters was the authority of customs officers to deduct collection expenses, including their own salaries, from the import duties received in the course of their jobs. As opposed to a system by which government officials deposit the entire amount in the Treasury and then draw their expenses from funds appropriated for that purpose, the practice prior to the statute's enactment allowed customs officials effectively to determine their own salaries.

Cong. Globe, 30th Cong., 1st Sess. 464 (1848). Congress's objective, then, was primarily to ensure that such expenses resulted from proper appropriations, rather than depending on the whims of executive branch officials. Congress sought both to account for such expenses and to control them. While this legislative history may support Sato's claim that the concession fees for unofficial travel at issue in this case violate the statute, we have found nothing in the legislative history indicating a direct intent to benefit third parties such as Sato. Nor do any of the subsequent amendments to the statute, all of which involved essentially technical revisions, indicate an express intent to benefit anything other than the public fisc and Congress's appropriation power. *See* Act of Jan. 12, 1983, Pub.L. No. 97–452, § 1(10), 96 Stat. 2467, 2468; Debt Collection Act of 1982, Pub.L. No. 97–365, § 13(a), 96 Stat. 1749, 1757; Act of Sept. 13, 1982, Pub.L. No. 97–258, 96 Stat. 877, 948.

Although Congress did not expressly intend to benefit government contract bidders, Sato may nonetheless have standing if it is a "suitable challenger[ ] to enforce" the statute. *First Nat'l Bank & Trust,* 988 F.2d at 1276. Because this "test is not meant to be especially demanding," a would-be plaintiff is outside the statute's "zone of interests" only "if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke,* 479 U.S. at 399, 107 S.Ct. at 757. We think Sato satisfies this standard. Because it claims that the requirement to pay a percentage of unofficial travel proceeds to Morale Funds adversely affects it relative to its larger competitors, Sato is in effect arguing that its competitors are benefitting from an agency's scheme to raise money at Treasury's expense. Sato's "interests are [thus] sufficiently congruent with those of the [Treasury's] that [Sato is] not 'more likely to frustrate than to further ... statutory objectives.'" *First Nat'l Bank & Trust,* 988 F.2d at 1275 (quoting *Clarke,* 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12) (alteration to conform to *Clarke* ).

Our decision in *Hazardous Waste Treatment Council IV,* is not to the contrary. There, an organization of companies that treated hazardous waste and then marketed products derived from that waste sued under the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901–6992k, to force the EPA to adopt stricter environmental regulations for other companies. We held that the organization was not a suitable challenger because its members' interests were not "systematically" aligned with those of the statute. *HWTC IV,* 885 F.2d at 924. We were concerned that the treatment firms' interests were "'more likely to frustrate than further statutory objectives.'" *Id.* at 925 (quoting *Clarke,* 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12). Since the "ultimate interest of those firms [was] in making money, ... there [was] not the slightest reason to think that [their] interest in getting more revenue by increasing the demand for their particular treatment services [would] serve [the statute's] purpose of protecting health and the environment." *HWTC IV,* 885 F.2d at 924. Their interest, rather, was "to pursue regulation that encourages the alternatives with the greatest profit potential [for them] at the expense of others (say, recycling or incineration) that might be less profitable." *Id.* at 924–25. From the treatment firms' standpoint, then, "treatment is good and more treatment is better—whether the effect on health and the environment is good, bad, or indifferent." *Id.* at 925.

In *First National Bank & Trust,* we noted that the distinction between *Hazardous Waste Treatment Council IV* on the one hand and the Supreme Court's decisions in *Investment Company Institute v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971), and *Clarke* on the other was that in the latter cases, where the Court found prudential standing, "the potentially limitless incentives of competitors were channelled by the terms of the statute into suits of a limited nature brought to enforce the statutory demarcation." *First Nat'l Bank & Trust,* 988 F.2d at 1278. This is precisely what we have here. Sato's interests cannot diverge from the Miscellaneous Receipts statute as the interests of the challengers in *Hazardous*

*Waste Treatment Council IV* diverged from the Resource and Conservation Recovery Act because the former statute contains inherent limitations not present in the latter. The Miscellaneous Receipts statute requires depositing certain funds into the Treasury. Either the funds at issue in this case are covered by the statute or they are not. There is no possible gradation in the statute's requirement. Because a "statutory demarcation" thus limits what Sato can request, "we run [no] risk that the outcome could ... in fact thwart the congressional goal," *Hazardous Waste Treatment Council v. United States EPA,* 861 F.2d 277, 284 (D.C.Cir.1988).

### III.

■ Turning to the merits, we first address the appropriate standard of review. The district court ruled that because this case involves an APA challenge to a procurement decision, Sato had to show that the agency's policy had "'no rational basis'" or "'involved a clear and prejudicial violation of applicable statutes or regulations.'" *Scheduled Airlines Traffic Offices, Inc. v. Department of Defense,* No. 94–2128, slip op. at 5, 1994 WL 715608 (D.D.C. Dec.9, 1994) (quoting *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973)). A narrow standard of review, the district court concluded, was particularly appropriate due to "'the application of technical, and often esoteric, regulations to the complicated circumstances of individual procurements.'" *Id.* (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)). Sharing this view of the appropriate standard of review, the Government argues that cases challenging the merits of government contract awards control here. We disagree.

The procurement cases relied on by both the district court and the Government are inapplicable here because this case does not require us to review a technical procurement decision involving the exercise of agency expertise or discretion. Instead, we face a pure question of statutory interpretation independent of the complex factual determinations or policy judgments particularly within agencies' expertise. The question under the APA is not whether the Department acted arbitrarily or capriciously, as in ordinary challenges to procurement decisions, but rather whether it acted "in accordance with [federal] law." 5 U.S.C. § 706(2)(A). Although this may sound like a case for *Chevron* deference, *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), such deference is inappropriate here because the Defense Department has not been entrusted to administer, and thus has no authority to interpret, the Miscellaneous Receipts statute. *See Professional Reactor Operator Soc. v. United States NRC,* 939 F.2d 1047, 1051 (D.C.Cir. 1991) (no *Chevron* deference owed to agency interpretation of statutes "outside the agency's particular expertise and special charge to administer"). Nor are we persuaded by the Government that deference is appropriate because the General Accounting Office ruled in the Department's favor. While "[w]e regard the assessment of the GAO as an expert opinion, which we should prudently consider ... we have no obligation to defer" to it. *Delta Data Systems Corp. v. Webster,* 744 F.2d 197, 201 (D.C.Cir.1984). Rather, "it is 'the court [that has] the last word and [it] should not shrink from exercis[ing] its power.'" *Id.* at 202 (quoting *Wheelabrator Corp. v. Chafee,* 455 F.2d 1306, 1316–17 (D.C.Cir. 1971)) (alterations in original). The appropriate standard of review is thus *de novo.*

■ This brings us to the central issue in this case: whether the solicitation's requirement that the successful bidder pay a concession fee to the Morale Fund rather than to the Treasury violates the Miscellaneous Receipts statute. The statute's requirement that a Government official "receiving money for the Government from any source" deposit the money in the Treasury, 31 U.S.C. § 3302(b), derives from and safeguards a principle fundamental to our constitutional structure, the separation-of-powers precept embedded in the Appropriations Clause, that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," U.S. CONST. art. I, § 9, cl. 7. *See* 10 Comp. Gen. 382, 383 (1931) ("The requirement of [this] statute[ ] is nothing more than in furtherance of the [Appropria-

tions Clause].""); Kate Stith, *Congress' Power of the Purse,* 97 YALE L.J. 1343, 1364 (1988) (noting that the Miscellaneous Receipts statute "articulates the Principle of the Public Fisc[, that a]ll monies of the federal government . . . be claimed as public revenues, subject to public control through constitutional processes"). By requiring government officials to deposit government monies in the Treasury, Congress has precluded the executive branch from using such monies for unappropriated purposes.

Mindful of both the plain language of the Miscellaneous Receipts statute and its underlying purpose to preserve congressional control of the appropriations power, we have no doubt that concession fees for unofficial travel constitute "money for the Government" within the meaning of the statute. Travel agents pay the fees pursuant to contracts awarded by agencies of the United States, doing so in consideration for government resources—the right to occupy agency office space, to utilize government services associated with that space, and to serve as the exclusive on-site travel agent. The Supply Center's policy of requiring as a condition of awarding contracts that successful bidders pay concession fees into Morale Funds therefore violates the Miscellaneous Receipts statute.

Other courts have reached the same result. In a case virtually identical to this one, a disappointed bidder for an Air Force contract for commercial air travel challenged a provision of the solicitation requiring the contractor to contribute a portion of its proceeds to the local Morale Fund. *Reeve Aleutian Airways, Inc. v. Rice,* 789 F.Supp. 417 (D.D.C.1992). Unhesitatingly, the court found that the contracting scheme "violate[d] the express terms of 31 U.S.C. § 3302(b)" by requiring the deposit of public monies into a local Morale Fund. *Id.* at 421. Similarly, in *Motor Coach Industries v. Dole,* 725 F.2d 958 (4th Cir.1984), the Federal Aviation Administration diverted airport-user fees, money ordinarily deposited in the Treasury pursuant to the Miscellaneous Receipts statute, into a trust that it created to finance the purchase of airport buses. A disappointed bidder for the bus contract then sued the FAA for failing to follow government procurement regulations. Finding that the agency had engaged in an "end-run around normal appropriation channels . . . enabling it effectively to supplement its budget by $3 million without congressional action," *id.* at 968, the Fourth Circuit affirmed a district court order invalidating the contract and directing the FAA to deposit the trust's money into the Treasury.

Attempting to distinguish these cases, the Government argues that the district court here correctly determined that the unofficial travel concession fees did not constitute "money for the Government" within the meaning of the statute because the money "derived *solely* from *unofficial* travel purchased with *private* funds." *Scheduled Airlines,* slip op. at 7. This argument is inconsistent with the statute's unequivocal language. Government officials must deposit in the Treasury "money for the Government *from any source.*" 31 U.S.C. § 3302(b) (emphasis added). The original source of the money—whether from private parties or the government—is thus irrelevant.

Urging us to interpret the Miscellaneous Receipts statute "in harmony with the statutes authorizing the funding of NAFIs [nonappropriated fund instrumentalities]" such as Morale Funds, *see, e.g.,* 10 U.S.C. § 2783(a) (1994), the Government also argues that the NAFI statutes implicitly authorize payment of unofficial travel concession fees into Morale Funds. Seen in its best light, this argument appears to consist of two parts: because the Defense Department has authority both to finance Morale Funds outside of the normal appropriations process and to establish travel offices for military employees' personal needs, it presumably has authority to finance Morale Funds with proceeds derived from such travel offices; and because considerations of efficiency favor combining unofficial and official travel offices in a single procurement, the NAFI scheme implicitly permits agencies to combine the two offices and deposit unofficial travel proceeds in Morale Funds.

We think the Government's argument ignores two crucial details. First, the Morale

Fund plays no role in the contracts at issue in this case; rather, the fees derive from procurements administered by a government agency—the Supply Center or the Department of the Army—in compliance with standard government procurement laws and regulations. The fees thus constitute money for the Government, not for the Morale Fund. It is irrelevant whether agencies *could* establish unofficial travel offices separate from their official travel offices and finance Morale Funds with proceeds from the former—indeed, the Navy procures its travel services in just this way, *see* Ursini Nov. 8, 1994 Decl. ¶ 8—since the Supply Center and Army have not done so here. Second, even assuming the legality of the Navy's approach, the efficiency of combining the two offices can hardly justify reading the Miscellaneous Receipts statute contrary to its plain language. *See Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992) ("[W]hen a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished.").

Finally, not only does the travel scheme at issue here divert to Morale Funds revenues that should be deposited in the Treasury, but it also creates incentives for government officials to reduce even those funds that are deposited in the Treasury. By requiring contract awardees to deposit unofficial travel concession fees in Morale Funds and by considering the unofficial travel fee percentages when awarding contracts, agencies have an incentive to award contracts to bidders whose unofficial concession fees are highest even where other bidders, by offering higher official concession fees, would yield greater revenues for the Treasury. In one instance, the Department of the Army awarded a contract to a Sato competitor who had offered an official travel concession fee of 3.25 percent and an unofficial travel fee of 5.1 percent, even though Sato had offered a higher official travel fee, 3.7 percent. Based on the government's estimated travel volume, Sato's bid would have produced an additional $1.1 million for the Treasury. Ursini Oct. 2, 1994 Decl. ¶ 16.

The fact that the Supply Center amended its April 1994 solicitation to require that all bids contain official fee percentages larger than their unofficial fee percentages hardly eliminates the conflicting incentives. For example, if Company A bids 3 percent for unofficial travel and 6 percent for official travel while Company B bids 5 percent for each, all other factors being equal, the interest of the United States clearly favors Company A. Yet if government officials administering the program seek to increase payments to Morale Funds, they will, to the detriment of the public fisc, choose Company B.

## IV.

Because we find that the Department's policy requiring payment of the portion of concession fees deriving from unofficial travel to Morale Funds rather than to the United States Treasury violates the Miscellaneous Receipts statute, we need not address Sato's other arguments. We reverse the judgment in favor of the Department and remand for the district court to enter judgment for Sato and to grant such declaratory and injunctive relief as the district court deems appropriate.

*So ordered.*