(Slip Opinion)

# Applicability of the Miscellaneous Receipts Act to an Arbitral Award of Legal Costs

An arbitral award of legal costs does not qualify as a refund for purposes of the "refunds to appropriations" exception to the Miscellaneous Receipts Act. The Millennium Challenge Corporation therefore must deposit the award in the general fund of the Treasury.

March 6, 2018

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
MILLENNIUM CHALLENGE CORPORATION

You have asked whether the Millennium Challenge Corporation ("MCC") may retain an arbitral award of legal costs under the refund exception to the Miscellaneous Receipts Act, 31 U.S.C. § 3302(b).[1] The Act requires a federal official or agent "receiving money for the Government from any source" to deposit it in the Treasury "as soon as practicable without deduction for any charge or claim," *id.*, but the Act has long been understood to allow the retention of certain refunds to appropriations for amounts erroneously disbursed. Because the arbitral award cannot be viewed as such a refund, we conclude that the exception does not apply and that MCC must deposit the award in the general fund of the Treasury.

## I.

MCC is a government corporation within the Executive Branch that provides assistance to developing countries to promote economic growth and reduce poverty. *See* Millennium Challenge Act of 2003, Pub. L. No.

---

[1] *See* Memorandum for Curtis E. Gannon, Acting Assistant Attorney General, Office of Legal Counsel, from David P. Kassebaum & Richard J. McCarthy, Assistant General Counsels, Millennium Challenge Corporation (Mar. 23, 2017). In considering this question, we requested and received the views of the Department of State and the Office of Management and Budget. *See* E-mail for Sarah M. Harris, Deputy Assistant Attorney General, Office of Legal Counsel, from Richard C. Visek, Acting Legal Adviser, Department of State, *Re: Request for Views on a Miscellaneous Receipts Act Issue*, att. (Dec. 15, 2017 5:30 P.M.); E-mail for Sarah M. Harris, Deputy Assistant Attorney General, Office of Legal Counsel, from Heather V. Walsh, Deputy General Counsel, Office of Management and Budget, *Re: Request for Views on a Miscellaneous Receipts Act Issue* (Dec. 15, 2017 5:55 P.M.).

108-199, div. D, tit. VI, §§ 602, 604(a), 605(a), 118 Stat. 211, 211–12, 214 (2004) (codified at 22 U.S.C. §§ 7701, 7703(a), 7704(a)). MCC provides such assistance "in the form of grants, cooperative agreements, or contracts," *id.* § 605(b), and receives congressional appropriations to fund its programs and operations, including its administrative costs. In 2015, for example, Congress made "up to $105,000,000" available for MCC's "administrative expenses" out of a total appropriation of $901 million. Department of State, Foreign Operations, and Related Programs Appropriations Act, 2016, Pub. L. No. 114-113, div. K, tit. III, 129 Stat. 2705, 2722 (2015). The vast majority of MCC's appropriations are "no-year" funds, *see, e.g.*, *id.*, meaning that they "are not limited to use in any specific fiscal year" and "remain available . . . until expended," *Immigration Emergency Fund*, 20 Op. O.L.C. 23, 23 (1996).

In 2012, a contractor working on a Mali development program named MCC as a defendant in an international arbitration. Represented by the Department of State's Office of the Legal Adviser, MCC successfully argued for dismissal, and the arbitrator ordered the contractor to pay $715,104 in costs, comprising the arbitrator's costs and the legal costs incurred by the Department of State and MCC. MCC received $97,575 of that award, which reflected the amounts it expended for outside counsel, labor, and travel.

MCC has asked whether it may retain its portion of the award. It admits that the Miscellaneous Receipts Act generally requires federal officials to deposit in the Treasury the funds they receive for the government, and that no other statute expressly allows MCC to retain the funds. MCC contends, however, that the award "logically can be construed as a refund" related to the arbitration, since allowing MCC to retain that money would "make [the] agency whole" for expenditures that it unnecessarily incurred. Memorandum for Curtis E. Gannon, Acting Assistant Attorney General, Office of Legal Counsel, from David P. Kassebaum & Richard J. McCarthy, Assistant General Counsels, Millennium Challenge Corporation at 3, 5 (Mar. 23, 2017).

The Department of State disagrees, noting that it "has not viewed arbitral awards in general as falling" within the refund exception to the Act. E-mail for Sarah M. Harris, Deputy Assistant Attorney General, Office of Legal Counsel, from Richard C. Visek, Acting Legal Adviser, Department of State, *Re: Request for Views on a Miscellaneous Receipts Act Issue*, att.

at 1 (Dec. 15, 2017 5:30 P.M.). The Department of State may retain, and deposit into its International Litigation Fund, portions of some arbitral awards under 22 U.S.C. § 2710(e), but that statute does not apply here, and the Department of State accordingly deposited its share of the award in the Treasury. *See id.* at 1–2. The Office of Management and Budget concurs with that view. *See* E-mail for Sarah M. Harris, Deputy Assistant Attorney General, Office of Legal Counsel, from Heather V. Walsh, Deputy General Counsel, Office of Management and Budget, *Re: Request for Views on a Miscellaneous Receipts Act Issue* (Dec. 15, 2017 5:55 P.M.).

## II.

Enacted in 1849, the Miscellaneous Receipts Act provides that "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." 31 U.S.C. § 3302(b); *see* Act of Mar. 3, 1849, ch. 110, 9 Stat. 398. The Act codifies the "anti-augmentation principle," under which "an agency may not augment its appropriations from outside sources without statutory authority." *Application of the Miscellaneous Receipts Act to the Settlement of False Claims Act Suits Concerning Contracts with the General Services Administration*, 30 Op. O.L.C. 53, 56 (2006) ("*FCA Suits*"). As the United States Court of Appeals for the District of Columbia Circuit has recognized, "[b]y requiring government officials to deposit government monies in the Treasury, Congress has precluded the executive branch from using such monies for unappropriated purposes." *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*, 87 F.3d 1356, 1361–62 (D.C. Cir. 1996). The statute thus preserves Congress's constitutional control over the expenditure of public funds. *See* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law[.]").

While the Act applies to money received "from any source," the Executive Branch and the Comptroller General have recognized two exceptions to this general rule.[2] The first exception applies "when Congress has

---

[2] As we have repeatedly stated, the opinions of the Comptroller General do not bind the Executive Branch, but they may provide helpful guidance on appropriations matters and related questions. *See, e.g.*, *FCA Suits*, 30 Op. O.L.C. at 56 n.2. Our prior opinions

specifically authorized the agency to retain" recovered funds. *FCA Suits*, 30 Op. O.L.C. at 57. (Strictly speaking, that circumstance is not an exception, but rather an example of a specific statute modifying a general one.) The second exception addresses "refunds to appropriations" and permits an agency to retain a recovery of "an amount it erroneously paid from an appropriation or fund account." *Id*. This exception "is grounded in, guided by, and furthers the anti-augmentation principle," because retaining those funds "essentially returns" the agency "to the position it had occupied based on the authorization of Congress." *Id*. at 57–58. By keeping that refund, the agency does not improperly augment its appropriations from outside sources. Rather, the agency cancels out an erroneous payment and returns its appropriations to the level that Congress intended. *See id*. at 62.

The Executive Branch and the Comptroller General have repeatedly explained that the refund exception applies where the agency erroneously paid too much. In 1926, for instance, the Comptroller General described the "accepted and uniform rule of the accounting officers in the past": "if the collection involves a refund or repayment of moneys paid from an appropriation in excess of what was actually due," then the agency may treat the money as "credit to the appropriation originally charged." *Postal Service—Recovery of Indemnities Paid for Lost Mail*, 5 Comp. Gen. 734, 736 (1926) ("*Postal Service*"). In 1950, the Treasury Department and the Comptroller General jointly defined the refund exception as applying to "amounts collected from outside sources for payments made in error, overpayments, or adjustments for previous amounts disbursed, including returns of authorized advances." Treasury Department–General Accounting Office Joint Regulation No. 1, § 2(b) (Sept. 22, 1950), *reprinted in* 30 Comp. Gen. 595 (1950). And in a 1950 memorandum "amplif[ying]" that joint regulation, the Comptroller General emphasized that the types of refunds covered by the exception must "represent adjustments for excess

---

have specifically endorsed certain Comptroller General opinions concerning the scope of the refund exception. *E.g.*, *id*. at 59–60; *Apportionment of False Claims Act Recoveries to Agencies*, 28 Op. O.L.C. 25, 27–28 (2004); *see also Federal Claims Collection Standards*, 49 Fed. Reg. 8889, 8892 (Mar. 9, 1984) (preamble to a final rule issued jointly by the Department of Justice and the General Accounting Office noting that "[t]he law with respect to refunds has evolved largely through decisions of the Comptroller General" and expressing no intention "to change any existing administrative law with respect to refunds").

payments," and listed "items rejected and returned," "allowances" on unsatisfactory government purchases, and recoveries on partially or fully canceled contracts as further examples. Accounting Systems Memorandum No. 10, § 2(b) (Comp. Gen. Oct. 5, 1950), *reprinted in* 30 Comp. Gen. 614 (1950).

More recent statements have confirmed that the refund exception is limited to recoveries of money "'paid from an appropriation in excess of what was actually due.'" 2 Government Accountability Office, *Principles of Federal Appropriations Law* 6-172 (3d ed. 2006) ("*Federal Appropriations Law*") (quoting *Postal Service*, 5 Comp. Gen. at 736); *see also FCA Suits*, 30 Op. O.L.C. at 57–58 ("An agency that recovers an amount it erroneously paid from an appropriation or fund account essentially returns to the position it had occupied based upon the authorization of Congress."); *Federal Motor Carrier Safety Administration—Retention of Court-Ordered Restitution*, B-308476, 2006 WL 3956702, at *3 (Comp. Gen. Dec. 20, 2006) ("*FMCSA*") (the refund exception applies only when the agency recovers "an improper payment"). In 2004, for instance, the Comptroller General stated that the exception "operates simply and solely to restore to an appropriation amounts that should not have been paid from the appropriation." *Department of Energy—Disposition of Interest Earned on State Tax Refund Obtained by Contractor*, B-302366, 2004 WL 1812721, at *4 (Comp. Gen. July 12, 2004).[3]

When it comes to litigation, the Comptroller General has long held that funds recovered by the Department of Justice are not refunds unless "they represent recoveries of moneys theretofore illegally or erroneously paid from appropriated funds." *Accounting—Repayments to Appropriations*, 6 Comp. Gen. 337, 339–40 (1926). Thus, the Comptroller General deemed the refund exception inapplicable to a court-ordered restitution award compensating an agency for the costs of a criminal investigation. *FMCSA*, 2006 WL 3956702, at *3. "The restitution award at issue is not

---

[3] For example, the Comptroller General has opined that the refund exception applies to "[r]ecoveries of payments made under a fraudulent contract" as a result of an embezzlement scheme. *Appropriation Accounting—Refunds and Uncollectibles*, B-257905, 1995 WL 761474, at *3 (Comp. Gen. Dec. 26, 1995). Furthermore, an agency may retain refunds of payments "in excess of the value of the goods or services that the agency actually received from [a] contractor." *Bureau of Prisons—Disposition of Funds Paid in Settlement of Breach of Contract Action*, 62 Comp. Gen. 678, 680 (1983).

properly classified as a refund," that decision explained, because "crediting the agency's appropriation with the restitution award would not restore[] to the appropriation amounts that should not have been paid." *Id*. In other instances, the Comptroller General has concluded that agencies may not retain awards of legal costs unless a statute expressly authorizes the retention. *Court Costs for Defending Employment Discrimination Suits*, B-139703, at 2 (Comp. Gen. Mar. 2, 1978) (Department of Justice must deposit in the Treasury "award[s] of court costs to the Government" in cases arising under Title VII of the Civil Rights Act of 1964); 47 Comp. Gen. 70, 71–72 (1967) (National Labor Relations Board must deposit in the Treasury "moneys derived from a judgment for costs awarded . . . by a court" to the Board as a prevailing party). Although these determinations did not expressly address the refund exception, they are consistent with the conclusion that agencies may not retain funds in compensation for litigation expenses.

While most litigation awards must therefore be deposited into the Treasury, the refund exception does permit an agency to retain the portion of a judgment corresponding to an erroneous payment. Thus, in a False Claims Act suit, an agency may retain compensatory damages awards that reflect the payments the agency was fraudulently induced to make. *See FCA Suits*, 30 Op. O.L.C. at 59; *Apportionment of False Claims Act Recoveries to Agencies*, 28 Op. O.L.C. 25, 27 (2004) ("*FCA Recoveries*"); *Federal Emergency Management Agency—Disposition of Monetary Award Under False Claims Act*, 69 Comp. Gen. 260, 262 (1990) ("*FEMA*"); *Tennessee Valley Authority—False Claims Act Recoveries*, B-281064, 2000 WL 230221, at *2 (Comp. Gen. Feb. 14, 2000) ("*TVA*"). By contrast, if the agency recovers treble damages in a False Claims Act suit, the agency must deposit in the Treasury the portion of the award that goes beyond the actual losses incurred. *TVA*, 2000 WL 230221, at *3.

## III.

Applying these well-established principles, we conclude that MCC's arbitral award does not qualify as a refund for purposes of the exception to the Miscellaneous Receipts Act. The arbitrator awarded MCC the costs it incurred in connection with the arbitration. However, MCC did not initially pay those legal costs erroneously or "'in excess of what was actually due.'" 2 *Federal Appropriations Law* at 6-172. To the contrary,

MCC paid those costs in return for the actual services it received. Even if the contractor may be viewed as having wrongfully imposed such costs on MCC—because the contractor lacked a valid arbitration claim in the first place—MCC did not make, and the contractor did not receive, any "improper payment." *FMCSA*, 2006 WL 3956702, at *3. An agency's expenditure of funds for legal costs is a necessary incident of its operations, and those expenditures do not become erroneous or improper simply because the agency later prevails in the litigation.

In appropriating funds, Congress provided for MCC to incur "administrative expenses" like the legal costs at issue here. *See supra* Part I. Because Congress anticipated that MCC would incur administrative costs, these expenditures do not fall within the refund exception. *See* 2 *Federal Appropriations Law* at 6-162; *FMCSA*, 2006 WL 3956702, at *3 (concluding that, where congressional appropriations covered an agency's investigative costs, allowing the agency to retain an award reimbursing its investigative costs "would improperly contribute financial resources that supplement those already provided for the agency by Congress"). In other circumstances, Congress has expressly authorized agencies to retain recoveries similar to this arbitral award. *See, e.g.*, 22 U.S.C. § 2710(e)(1) (authorizing the Secretary of State to retain funds recovered from foreign entities "[t]o reimburse the expenses of the United States Government in preparing or prosecuting a proceeding before an international tribunal, or a claim against a foreign government or other foreign entity"). Yet Congress has made no such provision for MCC.

MCC emphasizes that retaining the arbitral award is necessary to make MCC whole and return it to the position it was in before it had to incur legal costs. But this argument proves too much, because the same could be said of any receipts recouping previous agency expenditures, not just those satisfying the "limited exception" for refunds. *FMCSA*, 2006 WL 3956702, at *4; *see supra* Part II. MCC's reasoning would expand the scope of the exception beyond its traditional boundaries, covering not merely cost awards in litigation, but also any compensatory damages awards that would make an agency whole following a loss attributable to an agency expenditure. MCC identifies no precedent for allowing agencies to retain awards of legal costs absent express statutory authority, even though the United States routinely receives such costs as the prevailing

party in litigation. *See, e.g.*, *Baez v. U.S. Dep't of Justice*, 684 F.2d 999, 1005–06 (D.C. Cir. 1982) (en banc) (per curiam).

MCC also contends that retaining the arbitral award would vindicate the purpose of the refund exception, since MCC receives "no-year" appropriations and thus could still spend the funds in support of its poverty-reduction mission. But the anti-augmentation principle applies "even though the appropriation is a no-year appropriation." 2 *Federal Appropriations Law* at 6-169. Congress chose to fund MCC's administrative expenses in general, and MCC spent the appropriated funds on legal costs. The fact that MCC might now spend the arbitral award on expenses more closely related to its core mission does not give the agency the authority to retain the arbitral award under the Miscellaneous Receipts Act. The Act requires that the money be deposited into the Treasury to preserve Congress's prerogative to determine how such additional receipts are to be spent.

Finally, MCC cites two Comptroller General opinions and one opinion of this Office holding that agencies could retain not only compensatory damages for false claims, but also recoveries for the costs of investigating false claims. *TVA*, 2000 WL 230221, at *2; *FEMA*, 69 Comp. Gen. at 263; *FCA Recoveries*, 28 Op. O.L.C. at 28 (citing *FEMA*, 69 Comp. Gen. at 263). Those decisions are distinguishable, however, because each involves a revolving fund, a funding mechanism by which Congress, rather than setting a particular funding level, "authorizes an agency to retain receipts and deposit them into the fund to finance the fund's operations." 3 *Federal Appropriations Law* at 12-85 (3d ed. 2008).[4] In the context of revolving funds, this Office and the Comptroller General have applied the refund exception not only to refunds of erroneous payments, but also to refunds of ancillary expenses that are inextricably linked to erroneous payments. *See, e.g.*, *FEMA*, 69 Comp. Gen. at 263 (investigative costs "were a direct consequence of the false claims FEMA paid and increased the magnitude of the . . . resulting losses"). By contrast, MCC's appro-

---

[4] *See FCA Recoveries*, 28 Op. O.L.C. at 25 n.1 (limiting the opinion's scope "to the revolving fund context"); *FEMA*, 69 Comp. Gen. at 263 (recognizing that the fund at issue "does not receive any appropriations to cover its administrative expenses or losses" because "Congress intended [it] to be self-supporting to the greatest extent possible"); *TVA*, 2000 WL 230221, at *1 (noting that TVA "charge[s] rates for power that will produce sufficient revenues to provide funds" for its operational needs).

priations reflect a degree of congressional control over agency appropriations that differs materially from the revolving-fund context. And in all events, the legal costs at issue are untethered from any initial erroneous payment. *See National Science Foundation—Disposition of False Claims Act Recoveries*, B-310725, 2008 WL 2229784, at *3 (Comp. Gen. May 20, 2008) (declining to apply the refund exception to a recovery of investigative costs that were "properly [paid] from an appropriation that is available for incurring costs for such investigations"); *FMCSA*, 2006 WL 3956702, at *3 (same). Allowing MCC to retain the arbitral award would therefore present more serious anti-augmentation concerns than are present in these revolving-fund cases.

\*　\*　\*　\*　\*

For the foregoing reasons, we conclude that the arbitral award of legal costs to MCC does not qualify as a "refund to appropriations" exempt from the requirements of the Miscellaneous Receipts Act. MCC therefore must deposit the award in the general fund of the Treasury "without deduction for any charge or claim." 31 U.S.C. § 3302(b).

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*
