**BRAZOS ELECTRIC POWER COOPERATIVE, INC.,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 98–837C.

United States Court of Federal Claims.

May 15, 2001.

Robert A. Jablon, Washington, D.C., attorney of record for plaintiff.

Genevieve Holm, Washington, D.C., with whom was Acting Assistant Attorney General Stuart E. Schiffer, for defendant.

## OPINION

LYDON, Senior Judge.

This case is before the court on motions for summary judgment. Plaintiff, Brazos Electric Power Cooperative, Inc., seeks the return of $16.5 million assessed by the U.S. Department of Agriculture, Rural Utilities Service, against Brazos as a penalty arising from the prepayment by Texas Utilities Electric Cooperative, Inc. of a promissory note to Brazos that had been assigned to Rural Utilities Service as a mechanism to repay Brazos debt to the Federal Financing Bank. Plaintiff claims that the Government's acceptance of the prepayment from TU Electric and collection of the prepayment penalty from Brazos breached the Government's contract with Brazos and violated a governing federal statute. For the reasons set forth below, the court grants plaintiff's motion for summary judgment as to liability and denies defendant's cross-motion for summary judgment.

## FACTS

Brazos Electric Power Cooperative, Inc. (Brazos) is a non-profit electric power cooperative organized and operating in the State of Texas. Since 1956 Brazos has financed various construction projects for the purpose of furnishing and improving electric service with loans from the Federal Financing Bank (FFB), an arm of the U.S. Department of the Treasury. These loans (Brazos FFB Debt) were guaranteed by the Rural Electrification Administration (REA), an agency in the Department of Agriculture that later (1994) became the Rural Utilities Service (RUS). RUS acted as the FFB's agent in collecting payments on Brazos FFB Debt, which by 1994 totaled more than $336 million. Prior to 1993 there were strict statutory limitations on the right of FFB borrowers to prepay their loans.

In 1979 Brazos purchased a 3.8% share of the Comanche Peak Nuclear Power Plant then under construction near Glen Rose, Texas, from Texas Utilities Electric Company (TU Electric). To finance the purchase Brazos borrowed $220,782,000 from the FFB. These funds were advanced under three promissory notes on various dates, at various interest rates, and with various maturities. Construction of the Comanche Peak plant was plagued by cost overruns and delays. Brazos filed suit against TU Electric in Texas state court charging, among other things, that TU Electric had failed to comply with Nuclear Regulatory Commission licensing requirements. ·Summary judgment was granted in favor of Brazos on the issue of liability. Brazos and TU Electric then entered negotiations to settle their litigation.

A settlement agreement was reached on July 5, 1988, under which TU Electric agreed to buy back the Brazos share of the Comanche Peak plant. In exchange therefor, the agreement provided that TU Electric would "execute and deliver to Brazos" a promissory note (TU Note) in the principal amount of $194,690,350.14, representing the outstanding principal of Brazos debt on the Comanche Peak project, plus interest at 9½% per annum until March 31, 2004 and thereafter at 8½% per annum for the remainder of the Note's 33–year term (until December 31, 2021). The settlement further provided that Brazos would immediately assign and transfer the TU Note to REA, pursuant to an Assignment Agreement, "as a mechanism for payment of the Brazos Comanche Peak

Debt" (*i.e.*, as a way to pay down Brazos's FFB loans).

The TU Note, Assignment Agreement, and Assignment referenced in the settlement agreement of July 5, 1988, were executed by Brazos and TU Electric contemporaneously on December 22, 1988. The Assignment was attached to the Assignment Agreement as Exhibit A. REA, in a "Consent and Acceptance of Assignment Agreement" signed by the agency's Administrator, "approv[ed] the terms, conditions and obligations set forth in the foregoing Assignment Agreement." Brazos thereupon assigned the TU Note to REA, and TU Electric began making quarterly payments on the TU Note to REA, rather than to Brazos, on December 31, 1988. REA accepted these TU Note payments and applied the funds toward paying down Brazos FFB Debt.

The TU Note executed by Brazos and TU Electric in 1988 was, by its terms, prepayable "at any time." However, if prepayment were made prior to June 30, 2004 (roughly the halfway point of the Note's term) the borrower (TU Electric) would have to pay a "prepayment penalty" in an amount specified in a schedule attached to the Note. By contrast, the Brazos FFB Debt was not automatically prepayable. Until 1993 the prepayment of FFB loans was governed by a federal statute, 7 U.S.C. § 936a (Section 306(a) of the Rural Electrification Act (RE Act) of 1936), which placed limitations on the rights of FFB borrowers to prepay their loans (though when permitted prepayments carried no penalties). Qualifying to prepay a loan was subject, among other conditions, to a determination by the Secretary of the Treasury that prepayment would not have an adverse effect on FFB's operation. In other words, FFB borrowers had no automatic right to prepay their loans.

To assure that TU Electric's right to prepay the TU Note would not be abridged by its tie to the Brazos FFB Debt, the parties established a trust mechanism in Paragraph 4 of the Assignment Agreement to enable prepayment of the TU Note to be uncoupled from prepayment of the FFB Debt. Paragraph 4 provided that TU Electric could prepay the TU Note "at any time in accor-

dance with the provisions thereof" unless such prepayment was impermissible under the terms of the Brazos FFB Debt. In the event of such impermissibility Paragraph 4 provided that TU Electric could prepay the TU Note by (1) depositing into a trust account sufficient funds to pay off the remaining principal and interest due on the Note and (2) paying the prepayment penalty directly to Brazos. Ongoing installment payments on the Brazos FFB Debt would then be made to RUS out of the trust corpus.

In August 1993 the federal law governing the prepayment of FFB loans was changed. Congress enacted an amendment to the RE Act of 1936—the so-called Refinancing Authority—which eliminated restrictions on the prepayment of FFB loans. Section 306(c) of the RE Act as added by Public Law 103–66, 107 Stat. 312, 7 U.S.C. § 936c. Under the new law "[a] borrower of a loan made by the Federal Financing Bank and guaranteed under section 306 [RE Act] may, at the option of the borrower, refinance or repay the loan or any advance on the loan, or any portion [thereof]." 7 U.S.C. § 936c(a). But the Refinancing Authority also introduced a prepayment penalty: "A penalty shall be assessed against a borrower that refinances or prepays a loan or loan advance, or any portion [thereof]." 7 U.S.C. § 936c(b). The methodology for calculating the prepayment penalty was set forth in the same subsection. The purpose of the prepayment penalty was to compensate the Government for the interest it would not collect over the full term of the loan.

On June 30, 1994, Brazos and the Federal Financing Bank executed a Refinancing Note to consolidate all outstanding Brazos debt to FFB (the Comanche Peak Debt and other Brazos Debt) into one new loan instrument (the Brazos FFB Note) in the principal amount of $336,580,610.06. Like its earlier promissory notes to the FFB, the new Brazos FFB Note was guaranteed by REA (now RUS) which collected payments and otherwise administered the loan on behalf of the FFB. The latest maturity date of any debt covered by the new instrument was January 2, 2024.

With respect to prepayment conditions, Part IIA, paragraph 10 of the Brazos FFB Note provided that "[f]or so long as the Refinancing Authority [7 U.S.C. § 936c] shall be in effect, the Borrower may elect to prepay all or any portion of the unpaid principal balance of [the FFB Note]." One of the prepayment conditions was a notification requirement that "[t]he Borrower shall deliver to FFB written notification of such prepayment election not less than 5 Business Days prior to the proposed date of prepayment . . . ." To effect a prepayment the borrower was required to pay "the outstanding principal amount . . . . all accrued interest . . . . plus the prepayment premium [penalty] required by the terms of the Refinancing Authority."

In the summer of 1995, after six and one half years of installment payments on the TU Note, TU Electric approached RUS about prepaying the balance of the TU Note. TU Electric informed Brazos of its intention and indicated that the amount of the prepayment would equal the outstanding principal and interest due, plus the prepayment penalty specified in the TU Note. While acknowledging that prepayment of the TU Note made it responsible for the prepayment penalty required by that Note, TU Electric maintained that it would not pay any additional penalty the Government might impose should RUS apply the funds toward (partial) prepayment of the Brazos FFB Note.

On July 24, 1995, Brazos's counsel, Joseph Riley, sent a letter to TU Electric's counsel, Neil Anderson, indicating that Brazos objected to prepayment of the TU Note if it would effect a prepayment of the Brazos FFB Note resulting in a prepayment penalty against Brazos. Riley stated Brazos's position that "TU Electric's ability to prepay its Note is fettered by the Assignment Agreement and by the fact that the law gives the option to prepay the Brazos Comanche Peak Debt to Brazos Electric." On August 24, 1995, Riley talked on the telephone with Dave Oblich in the Office of the General Counsel, Department of Agriculture (DoA), reiterating Brazos's position that "as the Borrower, Brazos Electric had the option whether or not its notes were prepayable and that TU Electric could not act independently with regard to prepaying its note to Brazos Electric's detriment."

In a letter to Terence Brady in DoA's Office of the General Counsel on August 30, 1995, attorneys for Brazos, Robert Jablon and Bonnie Blair, contended that if RUS had any intention of assessing a prepayment penalty against Brazos as a result of the TU Note's prepayment, then the prepayment "should not take place without resolving the matter." Brady responded to Jablon and Blair by letter dated September 15, 1995, rejecting Brazos's position on the prepayment penalty issue. Brady stated that "[i]f the [TU] note is prepaid in accordance with its terms, RUS will apply the payments for the accounts of Brazos in accordance with their [Brazos FFB Debt] terms."

On October 6, 1995, Lloyd Randolph of the Department of Justice, Civil Division, sent a detailed letter to Brazos's attorney, Robert Jablon, restating the Government's intention "to transfer the proceeds of the TU Prepayment to the Federal Financing Bank ("FFB") to be applied toward advances and associated charges on Brazos's promissory notes to FFB ("Brazos FFB Debt")." Randolph referred to a recent meeting at which Jablon had indicated to RUS that Brazos "would not object" to a TU prepayment "done in accordance with the Assignment Agreement." Randolph then outlined the Government's position that "the TU Prepayment accords with the Assignment Agreement and the TU Note." Jablon responded to Randolph in a letter dated October 10, 1995, refuting Randolph's contention that the TU Note and the Assignment Agreement gave RUS the authority to assess a prepayment penalty against Brazos based on a prepayment by TU Electric. Jablon restated Brazos's position that RUS could not accept prepayment of Brazos FFB Debt from TU Electric without Brazos's consent because only the borrower (Brazos) could elect to prepay under the governing law. Any prepayment by TU Electric had to comply with the Assignment Agreement, under which (in Brazos's view) "TU Electric bears the cost of any prepayment penalties."

With TU Electric and RUS clearly heading toward a deal, Brazos filed suit on October 6, 1995 in U.S. District Court (Western District of Texas) against the United States (RUS) and TU Electric, seeking declaratory and injunctive relief to prevent prepayment of the TU Note if a prepayment penalty would be charged against Brazos. The district court denied Brazos's request for injunctive relief on October 26, 1995. RUS then accepted TU Electric's prepayment of the TU Note on October 30, 1995. The prepayment amount, which totaled $190,239,508.67, covered the outstanding principal and accrued interest of the TU Note, as well as a prepayment penalty (as specified in the TU Note) of close to $10 million. RUS transferred these proceeds to FFB, which applied the bulk of the funds—$172,611,914.01—to partial prepayment of Brazos debt under the FFB Note, but only after setting aside $16,499,646.99 as a prepayment premium, or penalty. The amount of the penalty was calculated under a complex formula set forth in the Brazos FFB Note. The effect of the prepayment penalty was to increase the remaining balance on the Brazos FFB Note by $16.5 million.[1]

On August 28, 1997 the district court dismissed Brazos's lawsuit against the United States for lack of subject matter jurisdiction and ordered the case transferred to the U.S. Court of Federal Claims. See *Brazos Electric Power Cooperative, Inc. v. United States*, No. W95CA318 (W.D.Tex.1997). Brazos appealed this ruling to the U.S. Court of Appeals for the Federal Circuit, which affirmed the district court's order on May 19, 1998, 144 F.3d 784 (Fed.Cir.1998). Like the district court, the Federal Circuit held that exclusive jurisdiction rests with the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491 (1994), because (1) the action is a claim against the United States, (2) it is founded on an express contract with the United States, and (3) the amount in controversy is in excess of $10,000. Brazos then filed suit in this court on November 30, 1998.[2]

The parties filed respective motions for summary judgment in 1999 and oral argument was held on March 7, 2000. With the court's consent and encouragement, the parties then engaged in settlement discussions which lasted just over a year. In separate status reports filed on March 26, 2001, however, the parties informed the court that they had been unable to reach a settlement and

---

1. Brazos claims that the prepayment penalty is a "great injury" that "will have irreparable consequences to Brazos." Plaintiff asserts that increasing the remaining loan balance on the Brazos FFB Note by $16.5 million has negative consequences for the company's credit rating and ability to borrow money, and places a significant burden on Brazos to amass sufficient assets to pay additional debt. Based on the information of record it does not appear that the financial condition of Brazos is as dire as described. The court notes that since the onset of litigation between Brazos and the United States in 1995 at least two new loans have been made by RUS to Brazos. One, in the amount of $12,226,263, was approved by the National Rural Utilities Cooperative Finance Corporation on August 19, 1997, and another, in the amount of $75,696,000, was approved by RUS on April 3, 1999. These loans would appear to indicate that Brazos's credit rating and ability to raise money is still sound, and most importantly with the very government institution with which it is currently locked in litigation. In addition, as of December 31, 1998 Brazos's rate of equity to assets was 14.86% and its total margins and equities was $68,940,760. Brazos's net margins for 1998 were $880,553. So the evidence of record appears to indicate that Brazos has remained in sound financial condition.

2. Contemporaneously with the filing of plaintiff's Amended Complaint on November 30, 1998, Brazos moved that the court "notify" TU Electric of the instant litigation, in accordance with Rule 14(a)(1) of the Rules of the Court of Federal Claims, since TU Electric may have a third party interest in this action. The court issued such Notice by certified mail on February 17, 1999, advising TU Electric to appear within 40 days after service of the Notice, as required by Rule 14(g), if it wished to assert any claim or interest in the subject matter of the suit. A return receipt dated March 16, 1999 indicates that TU Electric received the court's Notice. TU Electric did not appear within 40 days, or anytime thereafter, to assert any claim or interest herein. Accordingly, TU Electric is not a party to this action. The court notes that even though it lacks jurisdiction over TU Electric (because it has no claim against the United States and is not the subject of a claim by the United States) and TU Electric has not chosen to join this action as a third party, TU Electric could nevertheless be bound in a later suit in another court by certain determinations made by this court in this case. See *Midwest Industrial Painting of Florida v. United States*, 1 Cl.Ct. 209, 211 (1983).

would each like to supplement the record with additional legal arguments and/or documentation. The court advised the parties, by order dated March 27, 2001. that it did not deem supplementation of the record to be necessary and that it was taking the case under advisement for the purpose of issuing an opinion on the issue of liability. On April 6, 2001, defendant filed a motion for reconsideration under RCFC 83.2(f), requesting that the court reconsider its order. The court directed plaintiff to respond to this motion, which it did in timely fashion on April 23, 2001. Defendant filed a reply thereto, which was filed by leave of the court on May 7, 2001, and plaintiff responded with another short brief, which was likewise filed by leave of the court on May 11, 2001. Plaintiff's response, defendant's reply, and plaintiff's further response all offered additional legal arguments and attached additional documentation, in effect supplementing the record in the manner the parties had initially requested in their status reports of March 26, 2001. In the interest of completeness, and allowing the parties the broadest range of argumentation, the court permitted all of the supplemental materials to be filed. Defendant's motion for reconsideration is therefore moot.

### DISCUSSION

Both parties have submitted voluminous briefs and argumentation, which have sometimes served as much to obfuscate as to clarify the legal issues. Nevertheless, the court agrees with the parties that no important facts are in dispute and that this case is essentially one of contract and statutory interpretation. In contract as well as statutory interpretation, the court's examination begins with the plain meaning of the document's terms. If the language of the contract or the statute is unambiguous, then the court's inquiry is at an end and the plain language is controlling. See *Goldsmith v. United States,* 42 Fed.Cl. 664, 668 (1999); *Wirth v. United States,* 36 Fed.Cl. 517, 525–26 (1996).

The questions that must be addressed in deciding this claim are the following:

(1) Did the terms of the Brazos FFB Note, the TU Note, the Assignment and the Assignment Agreement, individually or in any combination, permit RUS, over the objections of Brazos, to accept prepayment of the TU Note from TU Electric, apply the funds to prepay a portion of the Brazos FFB Note, and assess a prepayment penalty against Brazos?

(2) Did RUS have statutory authority under 7 U.S.C. § 936c (the Refinancing Authority), notwithstanding objections by Brazos, to apply funds received from TU Electric to prepay a portion of the Brazos FFB Note and assess a prepayment penalty against Brazos? ·

### *The TU Note, Assignment Agreement, and Assignment*

■ The court begins its analysis of the contract documents with the TU Note, executed by Brazos and TU Electric on December 22, 1988. Under the terms of this instrument, TU Electric (the "Borrower") was permitted to prepay the Note "at any time in whole or in part." If such prepayment was made prior to June 30, 2004, TU Electric was obligated to pay a "prepayment premium" or "prepayment penalty" (the terms are used interchangeably in the TU Note). The amount of the penalty was set forth in a payment schedule (of descending amounts through the years, depending on the date of prepayment) appended to the TU Note as Exhibit A. Thus, according to the clear terms of the TU Note, TU Electric had an unrestricted right to prepay the TU Note at any time, and was obligated to pay a penalty if such prepayment occurred before mid–2004.

Rather than collect payments from TU Electric on the TU Note, Brazos elected, with the express agreement of TU Electric and RUS, to assign the TU Note to RUS. As explained in the Assignment, this was done "for the purpose of establishing a mechanism for payment of Brazos' Comanche Peak Debt and a portion of Other Brazos Debt [all of which was later consolidated in the Brazos FFB Note]." The Assignment Agreement (to which the Assignment was attached as Exhibit A) made clear that "all payments by TU Electric in accordance with the [TU] Note to the Government .... shall be considered to

be in full and complete satisfaction of TU Electric's obligation under the [TU] Note to Brazos." In addition, the Assignment Agreement amplified the language of the Assignment in stating that the conveyance of the TU Note to RUS was made "not in extinguishment, but as a mechanism for payment of" Brazos FFB Debt. Accordingly, under the terms of the Assignment Agreement and Assignment TU Electric's quarterly payments to RUS from the end of 1988 to 1995 served the dual purpose of paying down both the TU Note and Brazos FFB Debt.

The Assignment Agreement, consistent with the terms of the TU Note, provided that "TU Electric may prepay the [TU] Note at any time." Two alternative methods of prepayment were specified. TU Electric could prepay either (1) "in accordance with the provisions" of the TU Note or (2) "if such prepayment is not permissible at such time, in whole or in part to any extent, under the terms of the Brazos Comanche Peak Debt or the Other Brazos Debt [subsequently consolidated in the Brazos FFB Note] .... by irrevocably depositing in a trust account .... [sufficient funds] .... to make payment of the remaining principal and interest .... payments due on the [TU] Note. Contemporaneously with the deposit of such [funds] in trust, TU Electric shall make payment of the prepayment premium [penalty] under the Note directly to Brazos."

Plaintiff argues that the foregoing instruments, executed contemporaneously on December 22, 1988, make TU Electric, not Brazos, liable for any and all prepayment penalties that might arise—*i.e.*, not only from the TU Note but from the Brazos FFB Debt as well. Plaintiff asserts that "[n]owhere do the contract documents state that Brazos is responsible for prepayment penalties." (Motion for Summary Judgment at 14.) Furthermore, "the mechanism the parties created to deal with prepayments, Paragraph 4 of the Assignment Agreement, is express and unambiguous that TU Electric must pay any such prepayment penalties." (*Id.*) The language referenced in Paragraph 4 of the Assignment Agreement requires TU Electric, after depositing funds sufficient to pay the remaining principal and interest on

the TU Note into the trust account, to "make payment of the prepayment premium under the Note directly to Brazos." Plaintiff also cites language from this paragraph requiring that any prepayment of the Brazos Comanche Peak [FFB] Debt out of the funds in the trust deposit be accompanied by "applicable prepayment penalties."

The court agrees with plaintiff that the cited language in Paragraph 4 of the Assignment Agreement—referring to prepayment by use of the trust mechanism—makes TU Electric liable for prepayment penalties not only on the TU Note (which is not in dispute), but also those penalties resulting from any subsequent prepayment of the Brazos FFB Debt. A prepayment penalty on the Brazos FFB Debt, though, would not be an additional assessment against TU Electric, since it would come out of a trust corpus consisting exclusively of the principal and interest already deposited to pay off the TU Note. The pertinent language in Paragraph 4 provides that the "deposit in trust may *thereafter* be terminated .... at TU Electric's request .... at such time or times as the underlying Brazos Comanche Peak Debt becomes prepayable, only by the release to REA [RUS] *from such deposit* .... of sufficient funds to prepay any of such Brazos Comanche Peak Debt in accordance with the terms thereof, *including* prepayment of *applicable prepayment penalties if any*" (emphasis added). This language is clear that any prepayment penalty assessed as a result of the prepayment of Brazos FFB Debt would be paid out of the same preexisting trust corpus. In other words, the amount of principal and interest on the Brazos FFB Debt that could be paid off would be diminished by the amount of trust funds needed to cover the prepayment penalty. TU Electric would not have to pay the prepayment penalty with additional funds.

The Government argues that the trust mechanism was no longer applicable at the time of the TU Note's prepayment because the Refinancing Authority enacted in 1993 had rendered it superfluous. Paragraph 4 did not establish the trust mechanism as the primary method of prepayment, the Government points out, but rather as a secondary

method of prepayment required to be used by TU Electric only "if" (as in 1988) prepayment of Brazos FFB Debt was impermissible. Since the Refinancing Authority had eliminated restrictions on the prepayment of FFB loans, the Government reasons that TU Electric was free in 1995 to prepay the TU Note under the primary method set forth in Paragraph 4—*i.e.*, "in accordance with the provisions [of the Note]." Those provisions, according to the Government, allowed TU Electric to pay the remaining principal and interest on the TU Note, as well as the prepayment premium, directly to the noteholder (RUS, as assignee of Brazos). Prepayment of the TU Note to RUS, under the terms of the Assignment, effected the prepayment of a portion of the Brazos FFB Note as well. This triggered the prepayment penalty which, in the Government's view, the borrower of the FFB Note, Brazos, was legally obligated to pay.

The question of which prepayment mechanism set forth in Paragraph 4 was controlling at the time of TU Electric's prepayment in 1995 turns on the meaning of certain language stating the conditions for the use of the trust mechanism alternative for prepaying the TU Note. Conditions are those acts or events that must exist before the performance under an existing contract clause is required. See *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex.1990). The pertinent language in Paragraph 4 reads as follows:

"TU Electric may prepay the [TU] Note at any time . . . . [I]f such prepayment is not permissible at such time, in whole or in part to any extent, under the terms of the Brazos Comanche Peak Debt or the Other Brazos Debt, it is understood and agreed that TU Electric may make a prepayment in full and complete satisfaction of all of its remaining obligations under the [TU] Note . . . . by irrevocably depositing *in a trust account* . . . . money . . . . or Government obligations . . . . sufficient . . . . to make

payment of the remaining principal and interest . . . . payments due under the [TU] Note." (Emphasis added.)

This is not the most artful phraseology, as it tends to blur the distinction between the two sets of debt obligations it references— the TU Note and the various Brazos FFB loans that were later consolidated in the Brazos FFB Note. Nevertheless, based on a careful reading of the subject language, the court finds that the wording of the Assignment Agreement lends itself to only one reasonable interpretation, and is therefore unambiguous as a matter of law. See *Grumman Data Systems Corp. v. Dalton,* 88 F.3d 990, 997 (Fed.Cir.1996). The Assignment Agreement says that TU Electric *must* use the trust mechanism to prepay the TU Note *if,* for any reason, the terms of the Brazos FFB Debt instruments (or the successor Brazos FFB Note) make prepayment of the TU Note directly to RUS impermissible.[3] Furthermore, the Assignment Agreement is absolutely clear in providing that "[c]ontemporaneously with the deposit of [funds to cover outstanding principal and interest] in trust, TU Electric shall make payment of the *prepayment premium* under the TU Note *directly to Brazos.*" (Emphasis added.)

The Government argues that RUS is not bound by the Assignment Agreement because it is not a party thereto. The Government contends that the contract between Brazos and RUS consists only of the Assignment and the Brazos FFB Note. In support of its argument that RUS is not a party to the Assignment Agreement, the Government points out that Brazos and TU Electric are specifically identified as "parties" to the instrument, whereas RUS merely signed a "consent and acceptance" thereof at the end of the document ("the undersigned [RUS] accepts, consents to and approves the terms, conditions and obligations set forth in the foregoing Assignment Agreement."). The court is not persuaded

---

**3.** The Government contends that "the second sentence of Paragraph 4 does not refer to whether *TU* is impeded from prepaying the TU–Brazos Note, but to whether *Brazos* is impeded from prepaying its debt to RUS." (U.S. Opposition and Cross–Motion to Brazos's Motion for Summary

Judgment at 17.) The Government has misread the pertinent language. The "Note" referenced throughout this provision is the TU Note (Definition (*o*) of the Assignment Agreement makes this clear) and the prepayment references in the provision apply likewise to the TU Note.

by this distinction. The Government acknowledges the Assignment to be a contract document between Brazos and RUS even though (in contrast to the Assignment Agreement) it bears no signature of any RUS official. Moreover, the Government's blithe disavowal of any contractual relationship between RUS and Brazos under the Assignment Agreement ignores the close interrelationship of that instrument and the Assignment.

The Assignment specifically provides that "[t]his assignment of the [TU] Note by Brazos to [RUS] is for the purpose of establishing *a mechanism for payment* of [the Brazos FFB Debt] *as defined in the Assignment Agreement to which this form of Assignment has been attached as Exhibit "A".*" (Emphasis added.) This language in the instrument of Assignment does more than merely reference the Assignment Agreement. It "defines" the mechanism for payment of Brazos FFB Debt in terms of the Assignment Agreement, and therefore brings the terms of that instrument directly into the Assignment. The mechanism for payment set forth in the Assignment Agreement includes the prepayment provisions in Paragraph 4. The court finds, therefore, that the Assignment incorporates by reference the language of the Assignment Agreement requiring that TU Electric prepay the TU Note into a trust account, and the prepayment premium directly to Brazos, if prepayment of the Brazos FFB Debt was not permissible. See *Firth Construction Co. v. United States,* 36 Fed.Cl. 268, 275 (1996). Prepayment of the Brazos FFB Note by TU Electric was not permissible because Brazos did not want it prepaid. Accordingly, it was incumbent upon RUS under the Assignment Agreement to ensure that TU Electric, in exercising its right to prepay the TU Note, deposit the outstanding principal and interest on the TU Note into a trust account and pay the prepayment premium directly to Brazos. RUS did not honor this contractual obligation toward Brazos.

The disposition of this case, however, does not turn just on the Assignment and Assignment Agreement. The core contract instrument between Brazos and RUS, to which the court now turns, is the Brazos FFB Note.

### The Brazos FFB Note

■ The Brazos FFB Note provides as follows with respect to prepayment: "For so long as the Refinancing Authority shall be in effect, the Borrower may elect to prepay all or any portion of the unpaid principal balance ...." together with accrued interest and the required prepayment penalty. This language sets two conditions for prepayment: (1) the Refinancing Authority must still be in effect and (2) prepayment must be at the election of the borrower. Condition (1) was met only insofar as at the time of TU Electric's prepayment in 1995 the Refinancing Authority (7 U.S.C. § 936c), enacted in 1993, was still the law. But the Refinancing Authority explicitly states that FFB loans may be prepaid *"at the option of the borrower,"* and TU Electric was not the borrower of the Brazos FFB Note. Condition (2), which restates the "borrower election" requirement of the Refinancing Authority, was clearly not met because Brazos, not TU Electric, was the borrower of the Brazos FFB Note and *Brazos did not elect to prepay.* The Brazos FFB Note also requires that written notification of a prepayment be delivered to RUS by the *borrower* not less than five business days before the date of prepayment. RUS received no such notification from Brazos, as Brazos did not wish to prepay.

Accordingly, the court finds that RUS breached the terms of the Brazos FFB Note when it accepted prepayment of the TU Note from TU Electric and, over the vigorous objections of Brazos, applied the proceeds to prepay a portion of the Brazos FFB Note.

The Government argues that RUS, as assignee of the TU Note, was obligated to honor the terms of that instrument. TU Electric, under the terms of the TU Note, had an unequivocal right to prepay it at any time. According to the Government this right of TU Electric created a corresponding duty on the part of RUS, under the TU Note and the Assignment Agreement, to accept such prepayment. "Under the Assignment Agreement to which Brazos was a party," the Government contends, "RUS then had a duty to apply the proceeds to the Brazos FFB Debt," triggering the prepayment penalty. (U.S. Opposition and Cross–Motion to Bra-

zos's Motion for Summary Judgment at 19–20.)

This argument, however, ignores other obligations of the Government (and TU Electric) under the Assignment Agreement toward Brazos. As previously discussed, Paragraph 4 of the Assignment Agreement allowed TU Electric to prepay the TU Note directly to RUS only if the Brazos FFB Note was prepayable, a basic condition of which was that the borrower of that note (Brazos) elected to prepay. But Brazos did not elect to prepay the Brazos FFB Note. Accordingly, RUS did not have a duty (nor a right) to accept any payment from TU Electric if it was to be applied toward prepayment of the Brazos FFB Note.

TU Electric did not purport to be exercising the "borrower's election" to prepay the Brazos FFB Note when it prepaid the TU Note. Nowhere in the record is there any evidence that TU Electric claimed that right, or that TU Electric intended to prepay any debt obligation other than the TU Note. RUS alone arrogated to itself the right to apply the funds received from TU Electric to partially prepay the Brazos FFB Note, and assess a prepayment penalty against Brazos in clear contravention of the Assignment Agreement and the Brazos FFB Note.

The Government maintains that the function of the trust mechanism was to allow TU Electric to prepay the TU Note even when *Brazos* was *not permitted by statute* to prepay the Brazos FFB Debt. This was indeed an important function of the trust mechanism. But it was not the only function. The trust mechanism also served as an alternative method for TU Electric to prepay the TU Note if *TU Electric* was *not permitted* to prepay *under the terms of the Brazos FFB Debt* (to which the TU Note prepayment was tied) because Brazos, as the FFB borrower, did not elect to prepay it.

With Brazos opposed to any prepayment of the Brazos FFB Note, and TU Electric de-

termined to prepay the TU Note, the trust mechanism should have been called into play. That was the only course the three parties could have taken consistent with their respective rights and duties under the three instruments in question—the TU Note, the Assignment Agreement, and the Brazos FFB Note. By using the trust mechanism, TU Electric could have exercised its right to prepay the TU Note, Brazos could have exercised its option not to prepay the Brazos FFB Note, and RUS could have continued to receive regular installment payments on the Brazos FFB Note (from the trust account rather than from TU Electric). As solicitous as RUS was toward TU Electric's right to prepay the TU Note, RUS should have shown similar respect for Brazos's right not to prepay the Brazos FFB Note to avoid the assessment of a prepayment penalty. One wonders whether the lure of a windfall might have colored the Government's actions.[4]

The Government contends that Brazos is the source of its own difficulties in this claim. If Brazos had simply taken its settlement money directly from TU Electric instead of having it paid to RUS, Brazos would have totally controlled any and all payments to RUS under the FFB Note. By choosing to structure a deal allowing a third party (TU Electric) to make payments to RUS for the purpose of paying down Brazos FFB Debt, Brazos assumed the risk that TU Electric might make a payment that could trigger the prepayment penalty on the Brazos FFB Note.

The Government suggests that Brazos could have tried to negotiate protection specifically against prepayment penalties on the Brazos FFB Debt in its contracts with TU Electric and RUS. First, it could have sought agreement with TU Electric, as part of the Assignment Agreement in 1988 or as an amendment thereto after enactment of the Refinancing Authority in 1993, to either (a) bar TU Electric from prepaying the TU Note or (b) have any prepayment of the TU Note

---

4. Whether TU Electric may also stand in breach of contract with Brazos is not a question for this court. TU Electric is not a party to this action and the court has no jurisdiction over TU Electric. See Footnote 2, *supra*. The court notes that Brazos is in litigation with TU Electric in the

State of Texas. The District Court of McLennan County issued summary judgment for TU Electric on August 17, 1999 (*Brazos Electric Power Cooperative v. Texas Utilities Electric Cooperative*, No. 98–3839–1). At the time of this opinion that case was still on appeal.

made directly to Brazos instead of to RUS. Both of these devices would have preserved Brazos's control over any. prepayment of the FFB Debt to RUS. Second, Brazos could have sought agreement with RUS, as part of the Brazos FFB Note in 1994, that RUS not treat a prepayment by TU Electric of the TU Note as a prepayment by Brazos of the FFB Note triggering the prepayment penalty due thereunder.

In this same vein, however, the court notes that the Government could also have taken steps to negotiate prepayment language to its liking in the Brazos FFB Note of 1994. The Government could have sought to broaden the definition of "borrower" in the prepayment provision of the Brazos FFB Note, crafted a definition of the term that included TU Electric, or simply inserted language specifically authorizing TU Electric to prepay the Brazos FFB Note. But the applicable language in the Brazos FFB Note is unambiguous that the "borrower" with the prepayment election is Brazos alone.

The court agrees with the Government that more explicit language, such as that suggested above, may have brought further clarity to the contract documents and may have helped to steer the parties around the pitfalls leading to the current litigation. But the existing language, as previously discussed, is already sufficiently clear to establish the responsibilities of TU Electric and Brazos for prepayment penalties on the respective notes. Moreover, the applicable provisions of the FFB Note, the Assignment and the Assignment Agreement unambiguously establish that Brazos cannot be held liable for any prepayment penalties on the Brazos FFB Note unless *Brazos* elected to prepay it.

Accordingly, the terms of the Brazos FFB Note precluded its prepayment against the will of Brazos, and RUS breached that contract when it accepted prepayment from TU Electric in 1995.

### 7 U.S.C. § 936c (Refinancing Authority)

■ The Refinancing Authority provides that an FFB borrower may "*at the option of the borrower*" prepay a loan or any portion thereof, 7 U.S.C. § 936c(a), and that a prepayment penalty "shall be assessed *against*

*[the] borrower,*" 7 U.S.C. § 936c(b). (Emphasis added.) The Government argues that Brazos conveyed its rights as a borrower to control and make payments on the Brazos FFB Note to TU Electric by assigning the TU Note to RUS "as a mechanism for payment of Brazos' Comanche Peak Debt and a portion of Other Brazos Debt" [later consolidated in the Brazos FFB Note]. According to the Government, "[t]he TU–Brazos Note, the Assignment, and the Assignment Agreement, the terms of which Brazos accepted before assigning the TU–Brazos Note to RUS, provide express contractual consent for the United States to accept the TU [Electric] prepayment and to apply the proceeds to the Brazos FFB Note at the 'option of the borrower' for purposes of 7 U.S.C. § 936c." (Defendant's Reply Brief at 4.)

As a matter of law, the Government argues, prepayment of the Brazos FFB Note in 1995 was "at the election of the borrower" when TU Electric exercised its contractual right to prepay the TU Note and RUS, pursuant to its contractual duties as assignee, accepted the prepayment and applied the proceeds toward prepayment of the Brazos FFB Note. Moreover, under the terms of the Brazos FFB Note, the borrower was required at the time of prepayment to pay outstanding principal, accrued interest, and the *prepayment premium* due on the Note. According to the Government, therefore, RUS did not breach the terms of the Refinancing Authority in prepaying the Brazos FFB Note or in assessing the prepayment penalty against Brazos, the "borrower."

These arguments are without merit. The Government ignores the plain meaning of the statute, which states in no uncertain terms that FFB loans may be prepaid *at the option of the borrower*. The Government does not contest that Brazos remained at all times the borrower of the Brazos FFB Note, and that Brazos protested the prepayment in 1995. But it argues that the statute, 7 U.S.C. § 936c(a), is not violated when prepayment "at the option of the borrower" occurs by operation of the borrower's contractual obligations. The borrower's contractual obligations have been scrutinized by this court, however, and they do not include responsibil-

ity for any prepayment penalty arising from the Brazos FFB Note because Brazos never conveyed away, in any of the contract instruments involved in this claim, its right to decide if and when to prepay that Note.

TU Electric never claimed that it was the borrower of the Brazos FFB Note or that it acquired any contractual right to prepay the Brazos FFB Note. TU Electric never purported to prepay any debt instrument in 1995 other than the TU Note. RUS had no authority under the statute, therefore, to treat TU Electric's prepayment of the TU Note as a "borrower's election" to prepay the Brazos FFB Note.

Accordingly, the court finds that RUS acted without statutory authority in applying the proceeds of the TU Note to prepayment of the FFB Note without the consent of Brazos, the FFB borrower, and then assessing Brazos with the prepayment penalty.

### Supplemental Briefing

As previously mentioned, the Government filed a motion for reconsideration on April 6, 2001, requesting that the court reconsider its order of March 27, 2001, denying both parties the right to supplement the record. Supplemental briefs by the two parties rendered the motion moot.[5]

The Government states in its motion that it wishes to "correct a significant error of fact" by plaintiff's counsel at oral argument which,

in the Government's view, "left the Court with a fundamental misunderstanding . . . . [and] . . . . may lead to a manifest error of law." (Motion at 1.) The Government cites a colloquy between the court and plaintiff's counsel which, the Government alleges, left the court with the misperception that the three "old form notes" which governed Brazos's Comanche Peak debt prior to their 1994 refinancing into the Brazos FFB Note were, by their terms, not prepayable, so that only the passage of 7 U.S.C. § 936(c) in 1993 created a situation whereby prepayment by TU Electric could make Brazos liable for a "prepayment premium." The Government cites language in the "old form notes" indicating that two of them were prepayable after 12 years and the third without any waiting period. According to the Government, the "old form notes" provide the contractual context addressed by Paragraph 4 of the Assignment Agreement and the "only plausible interpretation of Paragraph 4" is that "permissibility of prepayment is based upon the expiration of the 12–year period specified in the Old Form Notes, after which prepayment *is* permissible *but only with* the payment of a prepayment premium by Brazos." (*Id.* at 4, emphasis in the original.) When Brazos refinanced its "old form notes" in 1994, placing all of its FFB Debt under the new Brazos FFB Note, it became immediately prepayable. "[N]othing in Paragraph

---

5. Rule 83.2(f) of the Court (Reconsideration of Orders) provides that: "No response may be filed to a motion for . . . . reconsideration. However, the court will not rule in favor of such a motion without first requesting by order a response to it." Thus, under the rule neither party had an inherent right to brief defendant's motion or to submit additional documentation to the court. The court, exercising its prerogative under the rule, ordered plaintiff on April 9, 2001 to respond to the motion for reconsideration. Rule 83.2(f) makes no provision for any further reply by the moving party. Accordingly, the court advised defendant in its order that no reply would be necessary.

Plaintiff submitted its response on April 23, 2001, in compliance with the court's order, and attached materials which went beyond the scope of the court's order. These included a 1988 letter agreement signed by Brazos, TU Electric, and REA (RUS) just before the Comanche Peak settlement between Brazos and TU Electric in July 1988, containing references to how prepayment of the TU Note and Brazos FFB Debt

would be handled, as well as a series of correspondence and documentation exchanged between Brazos and REA in 1987–88. The court allowed the attachments to be filed in addition to the response brief on April 24, 2001. Defendant then submitted its unsolicited reply brief on May 3, 2001, attaching thereto copies of two of the three "old form notes" that governed Brazos Comanche Peak Debt prior to its consolidation in the Brazos FFB Note in 1994. Though these materials were not submitted pursuant to a court order, and were beyond the scope of briefing contemplated in a Rule 83.2(f) motion for reconsideration, in the interest of fairness the court ordered that they be filed on May 7, 2001. Plaintiff then filed an objection and motion to strike or, in the alternative, to file a brief response on May 9, 2001, attaching two letters from Brazos to REA in June and July 1988 bearing upon the aforementioned letter agreement regarding the Comanche Peak settlement. The court denied the motion to strike, but allowed plaintiff's brief response and attachments to be filed on May 11, 2001.

4 of the Assignment Agreement," the Government concludes, "precluded TU [Electric's] direct prepayment, absolved Brazos of its FFB prepayment premium, or required using the trust mechanism." (*Id.* at 5.)

Contrary to defendant's assertion, the court was not misled by the referenced colloquy with plaintiff's counsel. The colloquy, viewed in its entire context, indicated that plaintiff's counsel was uncertain whether Brazos had ever sought, or was ever allowed by the Government prior to the enactment of 7 U.S.C. § 936c, to prepay any part of its FFB Debt. The court was not under the misperception, as alleged by defendant, that the passage of the Refinancing Authority created the only situation in which a prepayment by TU Electric could make Brazos liable for a prepayment penalty. It was clear to the court from the terms of the Brazos FFB Note that Brazos would be eligible for any prepayment penalty that arose from *an election by the borrower* (Brazos) to prepay, and the court inferred (correctly) that the antecedent "old form notes" had the same "borrower election" terms. An election by the borrower to prepay the "old form notes" could have taken the form of Brazos consenting to TU Electric's prepayment (subject, of course, to the Government's willingness to accept prepayment), in which case Brazos would have been liable for the prepayment penalty. But Brazos did not give any such consent to TU Electric.

The court does not agree with the Government's "only plausible interpretation" of Paragraph 4 of the Assignment Agreement. The contractual terms governing the prepayability of the "old form notes" (Brazos Comanche Peak Debt) prior to 1994 are, contrary to the Government's opinion, not determinative in the court's interpretation of Paragraph 4. As discussed in detail earlier in this opinion, the Assignment Agreement addresses the prepayability not only of Brazos FFB Debt, but first and foremost of the TU Note. The crucial language in Paragraph 4—"if such prepayment is not permissible at such time"—refers to the prepayment by

TU Electric of the *TU Note*, and specifies that if the "terms of the Brazos Comanche Peak Debt ["old form notes"] or Other Brazos Debt" (to which TU Note payments are tied in the Assignment and the Assignment Agreement) make such a prepayment impermissible, then TU Electric may only prepay the TU Note by use of the trust mechanism. One of the terms governing the prepayability of the "old form notes" (and the successor Brazos FFB Note into which they were consolidated)—a term which the Government repeatedly ignores—was that "[t]he *Borrower* may elect" to prepay the instruments. (Emphasis added.) Brazos was the borrower of the FFB notes, not TU Electric. So TU Electric could not prepay them without the consent of Brazos. Contrary to the Government's assertion, therefore, Paragraph 4 of the Assignment Agreement *did* preclude TU Electric from directly prepaying the Brazos FFB Note, *did* require TU Electric to prepay the TU Note by use of the trust mechanism, and *did* absolve Brazos from any prepayment premium on the Brazos FFB Note.[6]

In short, the court rejects defendant's argument that there was any "significant error of fact by plaintiff's counsel" at oral argument that would lead the court "to a manifest error of law."

In its response to defendant's motion for reconsideration, plaintiff attached a letter agreement signed by Brazos, TU Electric and REA (RUS) on June 30–July 1, 1988, setting forth the signatories' "understanding of the conceptual framework to which we have agreed for completing and securing REA approval of the [Comanche Peak settlement, including the Assignment Agreement]." In the letter agreement the signatories specifically agreed that TU Electric could prepay the TU Note without restriction if the Brazos FFB Debt was prepayable without penalty, but that it must use the trust mechanism if the Brazos FFB Debt was not prepayable without penalty. The letter agreement stated that it was "to serve

---

**6.** During oral argument the court suggested that there may be some ambiguity in the prepayment provision of the Assignment Agreement. After a thorough review of the subject instrument, how-

ever, and for the reasons explained in this opinion, the court has determined that the pertinent language in the Assignment Agreement is unambiguous.

as an expression of intent of the parties and REA to set forth terms to be included in the definitive documentation."

Defendant argues that the court should not consider the 1988 letter agreement because it was merely a preliminary conceptual understanding that was merged into and superceded by the Assignment Agreement later that year. Since the Assignment Agreement was a final integrated contract, the Government asserts that the parol evidence rule bars the use of antecedent or contemporaneous extrinsic evidence, like the letter agreement, to supplement or vary its terms. See *David Nassif Associates v. United States,* 214 Ct.Cl. 407, 557 F.2d 249, 256 (1977). Plaintiff counters that the letter agreement does not violate the parol evidence rule because its terms are consistent with the language of the Assignment Agreement and it was offered not to modify the Agreement, but to explain the circumstances surrounding its formation. See *City of Tacoma v. United States,* 38 Fed.Cl. 582, 589 (1997). As the court agrees with plaintiff's interpretation of the Assignment Agreement in any event, and finds the prepayment terms of Paragraph 4 to be unambiguous, the parties' arguments with respect to the propriety of taking the letter agreement into consideration are superfluous.

The Government also addresses the notice requirement of the Brazos FFB Note, alleging that it is a condition imposed upon Brazos for the benefit of the Government and can therefore be voluntarily waived by the Government. This is a weak, essentially irrelevant, argument that does nothing to counter the fundamental weakness of the Government's case, *i.e.,* the fact that under the terms of the Brazos FFB Note and the antecedent "old form notes" only the "borrower" could elect to prepay. Indeed, if RUS had properly observed the notice requirement it could have avoided this entire legal imbroglio. In any event, regardless of whether RUS could waive the requirement that Brazos provide notice of its intent to prepay, it certainly had no right to grant the right to exercise that prepayment election to a non-borrower (TU Electric).

Next the Government argues that it had no authority to set up the trust mechanism because once it received the prepayment of the TU Note from TU Electric it was obligated under the Miscellaneous Receipts Act, 31 U.S.C. §§ 3302 *et seq.,* to deposit the money in the U.S. Treasury. See *Scheduled Airlines Traffic Offices, Inc. v. Dept. of Defense,* 87 F.3d 1356, 1361 (D.C.Cir.1996). This argument is self-serving and meritless. RUS should never have accepted the prepayment money from TU Electric in partial prepayment of the Brazos FFB Note because, under the terms of the Assignment Agreement and the Brazos FFB Note, as well as the statutory Refinancing Authority, 7 U.S.C. § 936c, only Brazos could elect to prepay it. By accepting prepayment from TU Electric, and assessing a prepayment penalty against Brazos, RUS breached its contract with Brazos. RUS may have been obligated by law to deposit the prepayment funds with the Treasury once they were received, but that after-the-fact requirement cannot obscure the prior breach.

The Government would have the court believe that it was a mere automaton, powerless to influence TU Electric's mode of prepaying the TU Note. On the contrary, RUS had affirmative duties to its contracting partner, Brazos, under the Assignment Agreement and the Brazos FFB Note. Under Paragraph 4 of the Assignment Agreement, for example, the trust account was to be established at a national bank "selected by TU Electric and Brazos, and acceptable to the Government." So RUS was tasked with an oversight role in the establishment of a trust mechanism. When Brazos objected to prepayment of the FFB Note because of the prepayment penalty, RUS should have steered TU Electric toward prepayment of the TU Note via the establishment of a trust account. This would have accorded with TU Electric's contractual right to prepay the TU Note, allowed continued installment payments on the Brazos FFB Note, and avoided any prepayment penalty. Instead, RUS breached its contract with Brazos by accepting prepayment of the TU Note directly from TU Electric and assessing a prepayment penalty on the FFB Note against Brazos.

Defendant's final argument—that the Government did not reap a financial benefit from the prepayment and that Brazos was not damaged by the transaction—can hardly be squared with the record. The conduct of RUS and Brazos—*i.e.*, the evident eagerness of RUS to consummate the transaction and Brazos's vigorous opposition to it—undermines defendant's contention that the prepayment produced no benefits or damages for the parties. The prepayment would appear to have benefitted the Government because it immediately received $190 million from TU Electric, which it could then reinvest or use for other purposes, whereas if the trust mechanism had been used, the Government would have received only the regular quarterly installment payments on the Brazos FFB Note. Brazos would appear to have been damaged because the prepayment penalty reduced the net amount of prepayment on the Brazos FFB Note and thus increased Brazos's remaining debt with the FFB. The actual amount of damages, however, cannot be determined this day. That issue must be addressed in subsequent proceedings.

### Other Issues

Plaintiff contends that the Government (RUS) was a "primary drafter" of the TU Note, Assignment Agreement and Assignment, so that any ambiguity in those instruments must be interpreted against RUS. See *Stuyvesant Dredging Co. v. United States*, 11 Cl.Ct. 853, 861, *aff'd*, 834 F.2d 1576 (Fed.Cir. 1987). The Government denies that the legal doctrine of "contra proferentum" applies in this case, arguing that the documents were not authored exclusively by the Government but were rather *ad hoc* arrangements negotiated by TU Electric and Brazos with participation from the Government in the drafting process. See *Consumers Ice Co. v. United States*, 201 Ct.Cl. 116, 475 F.2d 1161, 1165 (1973). Moreover, there is no ambiguity in any of the instruments that could justify the doctrine's use in the first place. See *Greco v. Department of the Army*, 852 F.2d 558, 560 (Fed.Cir.1988). The court agrees with the Government's legal argument (though not with its interpretation of the subject documents) that where, as here, the language is unambiguous, there is no legal basis for applying the doctrine of "contra proferentum."

Plaintiff also requested relief under the takings clause of the Fifth Amendment to the U.S. Constitution, as an alternative to the breach of contract claim. Brazos submitted no argument or evidence in support of this alternative theory, and the court finds no legal basis for the claim. The $16.5 million assessment against Brazos was a prepayment penalty emanating directly from a contract between Brazos and the Government. When, as here, the rights and duties of the parties are grounded in a contract, and the nature of the dispute is a money claim arising from that contract, the applicable legal theory is breach of contract rather than a taking. See *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786, 818 (1978).

### CONCLUSION

In summation, all of the contract and statutory authority governing the prepayment of the Brazos FFB Note—*i.e.*, the Assignment Agreement, the Brazos FFB Note and antecedent "old form notes," as well as the Refinancing Authority (7 U.S.C. § 936c)—gave the *borrower* the election to prepay. Brazos was the borrower of all the FFB loans involved in this claim, and therefore only Brazos could elect to prepay them. None of the contract instruments between Brazos and TU Electric contains any conveyance of that "borrower election" right from Brazos to TU Electric. Nor did TU Electric, when it prepaid the TU Note to RUS, purport to be exercising the "borrower's election" to prepay the Brazos FFB Note at the same time. Prepayment of the Brazos FFB Note was an action which RUS took on its own with the funds it received from TU Electric. It is abundantly clear that the trust mechanism set forth in Paragraph 4 of the Assignment Agreement was conceived specifically as a means to permit TU Electric to prepay the TU Note in the event that Brazos objected to the contemporaneous prepayment of the Brazos FFB Note. Therefore, RUS violated its contractual obligation to Brazos when it applied the funds received from TU Electric (prepaying the TU Note) toward partial prepayment of the Brazos FFB Note without the consent of Brazos. RUS violated its statutory obligation to Brazos as well, since

the Refinancing Authority likewise provided for prepayment of FFB loans only "at the option of the borrower." RUS was therefore statutorily barred from accepting prepayment of the Brazos FFB Note without the consent of Brazos.

Thus, the court finds that the Government breached its contract with Brazos and exceeded its statutory authority by prepaying the Brazos FFB Note without the consent of Brazos and by assessing the resulting prepayment penalty against Brazos. Summary judgment is appropriate where, as here, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Schuerman v. United States*, 30 Fed.Cl. 420, 434 (1994); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir. 1987).

Accordingly, the court hereby GRANTS plaintiff's motion for summary judgment on the issue of liability. Defendant's cross-motion for summary judgment is DENIED.

The parties are directed to advise the court as to further proceedings within 30 days. In the court's view a trial on damages should not be necessary if the parties make a good faith effort to resolve the matter.